Mitchell B. Ludwig, Bar No. 115903
mbl@kpclegal.com
KNAPP, PETERSEN & CLARKE
550 North Brand Boulevard, Suite 1500
Glendale, California 91203-1922
Telephone: (818) 547-5000
Facsimile: (818) 547-5329

Sam Brown (State Bar No. 308558)
Kramer Brown Hui LLP
3600 Wilshire Blvd., Suite 1908
Los Angeles, CA 90010
Telephone: (213) 310-8301
Fax: (213) 310-8302
sam@kbhllp.com

Attorneys for Plaintiff and Relator
HARRY LIFSCHUTZ, M.D., an individual

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF CALIFORNIA EX REL. HARRY LIFSCHUTZ, M.D., an individual,<br>Plaintiff,<br>v.<br>KAYSAM GHASSEMINJEAD, an individual; KENNETH CARVER, an individual; SANDRA MAGADA, an individual; DARHIAZEL RAMIREZ, an individual; MED PLUS, a California corporation; HOSPICE CARE, INC., a California corporation; AIM HOSPICE CARE, INC., a California corporation; MERIT HOSPICE CARE INC., a California corporation; MILLENNIUM HOSPICE CARE, INC., a California corporation; BLUE HEAVEN HOSPICE & PALLIATIVE CARE, INC., a California corporation; VIP HOSPICE CARE, INC., a California corporation; RELYABLE HOSPICE CARE, INC., a California corporation; TOLUCA HOSPICE CARE, INC., a California | NO. 2:21-cv-05328-JFW-MAR<br><br>SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

| | |
|---|---|
| corporation; GATES TO PARADISE HOSPICE CARE, INC., a California corporation; THOUSAND OAKS HOSPICE CARE, INC., a California corporation; MOUNT OLIVES HOSPICE, INC., a California corporation; HEALTHY LIFE HOSPICE, INC., a California corporation; BAGRAT LOBZHANIDZE aka BAGRAT LONZHANIDZE, an individual; and DOES 1-100, inclusive,<br><br>Defendants. | ) |

Plaintiff and Relator Harry Lifschutz, M.D. ("Relator"), and except as otherwise set forth herein, brings this action on behalf of the United States of America and the State of California for damages and penalties arising out of the claims for relief set forth herein and against the defendants identified below:

## THE PARTIES

1. Real Party in Interest, the United States of America, funds medical care through government healthcare programs such as Medicare, Medicaid, Federal Employees' Health Benefits Program, TRICARE/CHAMPUS, CHAMPVA, and other agencies and programs, acting through the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"), the Department of Defense, and other federal agencies.

2. Real Party in Interest, the State of California, funds a portion of Medicaid services and other healthcare services utilized by licensed hospice companies as well as Medi-Cal.

3. Plaintiff and Relator, Harry Lifschutz, M.D., has dual citizenship with Canada and the United States and is a resident of the State of California. Relator is also physician licensed in the State of California and is a Fellow of the American College of Surgeons (FACS) and Fellow of the Royal College of Surgeons of Canada (FRCSC).

////

4. Relator is informed and believes and based thereon alleges, that each of the hospice entity defendants described below were at the times relevant herein, either owned or controlled by one or more of the named individual defendants. Because the identify of other potential aiders and abettors and/or co-conspirators is statutorily protected from disclosure due to the medical privacy laws, and, as such, is exclusively within the control of the defendants and/or Medicare or Medi-Cal for which discovery or a Court Order will be necessary to reveal, Relator reserves the right to amend this Second Amended Complaint to include other individuals who may be responsible in whole or in part for the wrongful conduct alleged herein.

**The Ghasseminejad Defendants**[1]

5. Med Plus, Hospice Care, Inc., a California corporation; AIM Hospice Care, Inc., a California corporation ("AIM Hospice"); Merit Hospice Care Inc., a California corporation ("Merit Hospice"); Millennium Hospice Care, Inc., a California corporation ("Millennium Hospice"); Blue Heaven Hospice & Palliative Care, Inc., a California corporation ("Blue Heaven Hospice"); VIP Hospice Care, Inc., a California corporation ("VIP Hospice"); Relyable Hospice Care, Inc., a California corporation ("Relyable Hospice"); Toluca Hospice Care, Inc., a California corporation ("Toluca Hospice") (collectively the "Ghasseminejad Hospice Defendants") were at all times relevant herein licensed as hospice companies, and Kaysan Ghasseminejad, an individual, ("Ghasseminejad") was their controlling shareholder, member, officer, director and otherwise the individual factually and legally responsible for all actions undertaken by such entity.

**The Carver Defendants**

6. Gates to Paradise Hospice Care, Inc., a California corporation (the "Carver Hospice Defendant") and Kenneth Carver, an individual ("Defendant Carver", collectively with the Carver Hospice Defendant, the "Carver Defendants").

---

[1] Kaysan Ghasseminejad was erroneously spelled Kaysam Ghasseminjead in the original and First Amended Complaint. It has been corrected herein.

**The Magada Defendants**

7. Thousand Oaks Hospice, Inc., a California corporation (the "Magada Hospice Defendant") and Sandra Magada, an individual ("Defendant Magada", collectively with the Magada Hospice Defendant, the "Magada Defendants").

**The Ramirez Defendants**

8. Mount Olives Hospice, Inc., a California corporation (the "Ramirez Hospice Defendant") and Darhiazel Ramirez, an individual ("Defendant Ramirez", collectively with the Ramirez Hospice Defendant, the "Ramirez Defendants").

**The Lobzanidze Defendants**

9. Healthy Life Hospice, Inc. a California corporation (the "Healthy Life Hospice Defendant") (Collectively the "Lobzhanidze Hospice Defendant") and Bagrat Lobzhanidze aka Begrat Lonzhanidze ("Defendant Lobzhanidze", collectively with the "Lobzhanidze Hospice Defendant, the "Lobzhanidze Defendants")

10. The true names and capacities, whether individual, corporate, associate or otherwise of Defendants Does 1 through 100, inclusive, are unknown to Relator, who therefore sues said Defendants by such fictitious names. Relator is informed and believes and thereon alleges that each of the Defendants designated herein as a fictitiously named Defendant is in some manner responsible for the events and occurrences herein referred to, either contractually or tortiously and caused the damage as herein alleged. When Relator ascertains the true names and capacities of DOES 1 through 100, inclusive, he will seek leave, if necessary, to amend this Second Amended Complaint accordingly.

## FEDERAL JURISDICTION AND VENUE

11. This action arises under the federal False Claims Act, 31 U.S.C. § 3729 et seq. Therefore this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

////

12. This Court also has personal jurisdiction over Defendants because, during the relevant period, they maintained offices, conducted business, enrolled patients, submitted or caused the submission of claims for government reimbursement, and committed the acts alleged in this Complaint within the Central District of California.

13. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants resided, were found, and/or transacted business in this District, and because a substantial part of the acts and omissions constituting the alleged violations of the False Claims Act occurred in this District, including in Los Angeles County, California.

## FEDERAL AND STATE STATUTES AT ISSUE

### Federal and State False Claims Act

14. The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1863 to combat fraud during the American Civil War by defense contractors. It has been substantially amended and modernized since including in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA").

15. The FCA generally provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements material to a false claim, or conspires to engage in such conduct, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Federal Government.

16. The FCA allows any person having information about false or fraudulent claims to bring an action for himself or herself and the Government and to

share in any recovery. Based on these provisions, Relator seeks, through this action, to recover all available damages, civil penalties, and other relief for the state and federal violations alleged herein.

17. This action is also brought pursuant to the California False Claims Act, Government Code § 12652 which is similar in most regards to the FCA.

**Federal Health Care Programs at Issue**

18. In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §§1395 to 1395ccc. Outpatient prescription drugs are covered under Parts A-D of the Medicare Program.

19. In 1965, the Federal Government also enacted the Medicaid program. Medicaid is the nation's medical assistance program for the needy, the medically needy, aged, blind, and disabled and families with dependent children. 42 U.S.C. §§ 1396-1396v. Medicaid is largely administered by the states and funded by a combination of federal and state funds. The State of California contributes significantly to Medicaid funding with the federal government providing the balance of the funding.

20. Under the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A), there is an express fundamental condition of payment: "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury." This condition links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." Medicaid and other federally funded programs restrict coverage under the same principle.

21. Medicare and the other federally funded programs require the submission of documented and properly coded claims which include the implied or express representation that the medical treatment, surgery or procedure was

medically necessary (hereinafter referred to as the "Medical Certification".)

**State Health Care Programs at Issue**

22. Medi-Cal is California's Medicaid program. This is a public health insurance program which provides needed healthcare services for low-income individuals including families with children, seniors, persons with disabilities, foster care, pregnant women, and low-income people with specific diseases such as tuberculosis, breast cancer, or HIV/AIDS. Medi-Cal is financed equally by the state and federal government.

**Hospice Care Programs**

23. When a Medicare (or other government healthcare) patient is diagnosed as being terminally ill with a prognosis of less than six (6) months to live, he may elect to obtain hospice care instead of curative care. 42 C.F.R. §418.24. This election, made by the patient after being advised of his rights, focuses on a family centered multidisciplinary approach to the process of death. The care is described as "palliative" which is defined in 42 C.F.R. §418.3(3) as: "Palliative care means patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering. Palliative care throughout the continuum of illness involves addressing physical, intellectual, emotional, social, and spiritual needs and to facilitate patient autonomy, access to information, and choice."

24. All other Medicare benefits are waived during the time of the election and unless it is revoked. 42 C.F.R. §418.24.

25. Federal Rules provide strict guidelines for hospice providers, patients and care because the Medicare per diem payment is costly to the government: approximately $199 per day per patient enrolled. 42 C.F.R. §418.301 et seq. These conditions of participation include a comprehensive assessment that identifies each potential patient's need for hospice care and services including the need for physical, psychosocial, emotional and spiritual care. 42 C.F.R. §418.52.

////

26. Hospice rules provide and list the content requirements and time deadlines within which the initial comprehensive assessment must be completed. 42 C.F.R. §418.54. Rules also require updates of the comprehensive assessment by the hospice interdisciplinary group (in collaboration with the patient's attending physician, if any) which must consider changes that have taken place since the initial assessment. This reassessment must be completed in accordance with 42 C.F.R. §418.54(d).

27. The purpose of these and other hospice laws, rules and regulations are to ensure that only qualified patients are accepted by Hospice providers and patients who were initially assessed as eligible, but are later found to be or become ineligible, be converted to more conventional treatment and care providers. 42 C.F.R. §§418.22; 418.25; 418.26(a)(2) and (3).

28. Each and every hospice care provider, as a condition of participation in the program, must comply with all federal, state and local laws and regulations related to the health and safety of patients. 42 C.F.R. §418.116.

29. Under the Social Security Act (42 U.S.C. §§ 1302 and 1395hh, et seq.), "An individual is 'terminally ill' if he or she has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A). This definition is further clarified at 42 C.F.R. §418.3 to provide for a life expectancy of 6 months or less "if the illness runs its normal course."

30. Information concerning patients enrolled in hospice can be obtained through the Noridian Medicare Portal which is the official web-based platform operated by Noridian Healthcare Solutions, a Medicare Administrative Contractor ("MAC") for CMS, which provides Medicare and Medicaid beneficiary and claims information, including the National Provider Identifier ("NPI") of the hospice provider that submits the Medical Certifications and hospice reimbursement claims. It also contains information such as eligibility periods, enrollment periods, dates of payment and other related information.

31. Based on documents, information and reports maintained by the Noridian Medicare Portal, the events described herein occurred primarily after April 2020, although the Noridian Medicare Portal reflects that at least one patient had been enrolled with Toluca Hospice for one month in 2018. Relator did not discover the Toluca Hospice admission until after April 2020.

## FALSE CLAIMS ACT VIOLATIONS

32. The Defendants' and each of their conduct, as further alleged herein, all fall under essentially the same pattern and practice and as such, each of them individually and separately violated the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq., ("FCA") and provisions of the California False Claims Act on behalf of the State of California, Government Code § 12652 ("CFCA").

33. Relator is informed and believes and based thereon alleges that all of the Defendants recruited patients through the same common and fraudulent scheme. Through the use of paid recruiters, they would solicit patients and obtain their Medicare numbers. Some of the names of these recruiters have been identified by Relator's patients, as "Tina," "Angelica," and "Guillermo. A. Ramirez." Each of these recruiters took advantage of unsophisticated and elderly patients – often non-English speaking – and convinced them to give up their regular Medicare coverage by joining their purportedly free additional health care program benefits in exchange for various gifts, like diapers, shoes, wheelchairs, walkers and scooters as well as promises of expanded medical care. Two of the recruiters provided his or her business cards to Relator's patients which advertise the services they provide. An example follows:






Interpreted, the information states that they are offering "*home care*," and represents that there is "no need to change your health plan to receive these benefits," and "*we have a team of professionals to refer and assist you*," and then it lists "Doctors (Doctores), Pharmacists (Farmacéuticos), Nutritionists (Nutriólogos), Volunteers (Voluntarios), Professional staff (Personal professional), Nurses Enfermeros), Physical therapy (Terapia física), Social workers (Trabajadores sociales), and Professional counselors (Consejeros profesionales)." The cards promote their services 24 hours a day, 7 days a week and that they can provide: "Wheelchairs (Sillas de ruedas), Walkers (Caminadores), Orthopedic shoes (Zapatos ortopédicos), Therapeutic beds (Cama terapéutica), and Transportation to Mexico (Transportes al México)." Significantly, the card states "*100% Covered by Your Medical Insurance.*"

34. Relator is informed and believes and based thereon alleges, that the recruiters would then provide the ill-gotten Medicare numbers to the hospice companies for a kick back, referral fee or other compensation. The hospice companies would then obtain a fraudulent Medical Certification from a new physician who, Relator is informed and believes and based there on alleges, never saw, interviewed or evaluated the patient. As described below, one such physician was Cyrus R. Lavian, M.D.

35. The patients would then be enrolled with the purchasing hospice company. As a result of being enrolled in hospice, the patients would be removed from regular Medicare or Medi-Cal health insurance and denied coverage for their PCP, such as Relator.

36. Based on Relator's professional relationship with these patients, he determined that many of his patients either never understood or were incapable of understanding that they were giving up their regular insurance coverage as well as their doctors including Relator, in exchange for purported additional benefits, and enrolled in hospice care. Indeed, at least one of the recruiters represented: "*You do*

*not need to change your health plan to receive these benefits*." Set forth on Exhibit A hereto is a sampling (the names have been abbreviated to protect their right to privacy) of some of Relator's patients who were recruited through this False Claim Act scheme. Exhibit A includes the Patient Name, the Hospice Company National Provider Number ("NPI"), Hospice Company Name, Dates of Enrollment based on the Noridian Medicare Portal information, and Relator's diagnosis of the known non-life ending medical condition of the patient. Exhibit A is incorporated herein by this reference as though set forth in full.

**Patients Enrolled With The Ghasseminejad Hospice Defendants**

37. As it relates to Ghasseminejad and the Ghasseminejad Hospice Defendants specifically, Exhibit A reflects that the following patients of Relator were enrolled with the Ghasseminjad Hospice Defendants through this False Claim scheme: M.A., F.G., F.L., A.M., S.M., F.P., R.T., and H.L. Exhibit A also reflects Relator's diagnosis as to their medical issues and none were end of life (See Exhibit A attached hereto.)

**Discovery Of Fraudulent Hospice Enrollments**

38. After April 24, 2020, but in 2020, Relator began receiving payment denials from Medicare and/or Medi-Cal for legitimate medical care that he had provided to his patients and billed notwithstanding that each of them were enrolled with Medicare and/or Medi-Cal and entitled to medical services paid for by these government programs. The reason provided to Relator was that these patients were enrolled in hospice which was being paid by Medicare and/or Medi-Cal.

39. Relator also started to receive calls from pharmacies and third-party home health agencies advising that they could not fill his prescriptions or provide ordered services he prescribed. The reason provided to him was that the patients had been enrolled in hospice and that all medical expenses and needs were being paid for by Medicare and/or Medi-Cal.

////

40. Relator interviewed his patients to determine if they were receiving medical services while under "hospice," and learned that none of them had seen a nurse or doctor and had never been examined by anyone and were in fact not in a hospice facility or receiving hospice care anywhere.

41. One of Relator's patients M.A., provided Relator with select pages from their Explanation of Benefits ("EOB") denials which he reviewed. These EOBs that denied reimbursement for the services actually provided or ordered by Relator, provided the explanation that "According to Medicare hospice requirements, this service is not covered because the service was provided by a non-attending physician" and listed the hospice company purportedly providing hospice care, showing the period in which hospice care was provided and reflected the payments that had been made to the hospice company. The EOB allowed Relator to correctly conclude that somehow these patients had been removed from his care and enrolled in hospice (1) without their knowledge or true consent; (2) without his knowledge or consent; (3) without qualifying for hospice, and (4) without actually receiving hospice services. Relator corroborated the statement on the EOBs that Medicare payments were being made for hospice services by reviewing the Noridian Medicare Portal that reflected the patients' enrollment and billing periods.

42. Each of the patients identified on Exhibit A were later discharged from hospice either after Relator began investigating why they were in hospice or before the initial hospice benefit period expired, which was the most lucrative period for hospice reimbursement.

43. As the patients' PCP, Relator was responsible for determining whether and when a patient required end of life hospice or home health services. Based on his personal knowledge and treatment of these patients, none were eligible for hospice care, as none suffered from a terminal illness or other condition warranting hospice enrollment. (See Exhibit A for additional detail on the patients known medical condition.)

44. Because Relator knew that he had not referred these patients to hospice, as they were not medically eligible for hospice care, and his concern for patient safety as at least one of his patients was unable to obtain their medication because prescriptions were now controlled by the hospice companies, he commenced a further investigation into the circumstances surrounding their hospice admissions. His efforts, some of which were also described above, included the following:

(a) reviewing the patient's EOBs which reflected that the denial was based on the patient being enrolled with hospice and that Medicare or Medi-Cal was paying for hospice care;

(b) reviewing his patient's billing records which reflected that his bills were denied because the patients were allegedly being covered by hospice benefits;

(c) reviewing the patient's records through the Noridian Medicare Portal;

(d) contacting the hospice companies by telephone, although those efforts were largely if not completely unsuccessful because the calls either went unanswered, messages left were not returned, or if he was able to speak to anyone, they had no idea who the hospice companies were and could not provide any information as to the patient's status (although in some instances the patients were then discharged from hospice);

(e) communicating with pharmacies and home health agencies to which he had submitted prescriptions or referrals for services, which advised that the prescriptions or services could not be provided because the patient had been enrolled in hospice; and

(f) interviewing his patients regarding their knowledge of, or consent to, their hospice enrollment and learning that none of his patients knowingly enrolled in hospice or were aware that they had given their Medicare or Medi-Cal number to someone who used that information to enroll them in hospice.

45. From publicly available information, Relator also was able to determine which hospice provider was enrolling his patients. The Noridian Medicare Portal

identifies the hospice provider by its NPI. The Nordian Medicare Portal also identifies the enrollment period and period in which the hospice provider sought reimbursement for purported hospice-related services. Public records were used to identify the office or mailing address for the hospice companies. From this information he was able to learn that many of these patients were enrolled with the Ghasseminejad Hospice Defendants as reflected above and that most if not all of these companies were operating out of the same offices, including 17835 Ventura Boulevard or 16200 Ventura Boulevard, Suite 301, Encino, California.

**A Specific Example of the Scheme as Applied to Patient M.A.**

46. The December 2020 EOB for M.A. reflects that Relator treated M.A. on August 13, 2020. Relator performed medical services which he then submitted to Medicare for reimbursement. Sometime between September 22, 2020, and December 21, 2020, Medicare denied the claim for these services and sent M.A. the EOB. On the EOB, the services Relator provided were all denied reimbursement, with a footnote "a" which was tied to "Notes for Claims Above." In the "Notes for Claims Above" section, it explains that "a" relates to the following explanation: "According to Medicare hospice requirements, this service is not covered because the service was provided by a non-attending physician." In other words, Relator had been replaced as the PCP due to enrollment in hospice.

47. The same EOB reflects that Medicare had approved a claim submitted by Defendant Med Plus Hospice Care, coded as Hospice/Rtn Home, Skilled Nursing Visit, allegedly taking place between September 1, 2020 and September 21, 2020. The Medicare Claim Number was 2202XXXXXXX07CAR"[2]. According to the EOB, Medicare paid Med Plus Hospice Care $2,966.78 for this service—a service that was never provided. A redacted version of this EOB is attached hereto and incorporated herein as Exhibit B. The EOB identifies physician Cyrus R. Lavian,

[2] The full number has not been provided for patient privacy reasons.

M.D., whose practice, Plaintiff is informed and believes and based thereon alleges, is in the San Fernando Valley, California, which is over two hundred miles away from Calexico, California where M.A. resided. Plaintiff is further informed and believes and based there on alleges that Ghasseminejad and the Ghasseminejad Hospice Defendants and Dr. Lavian conspired to knowingly provide fraudulent medical certifications to government agencies as evidenced by the EOB attached hereto as Exhibit B. As further alleged herein, none of Relator's patients including M.A., ever saw Dr. Lavian or any other physician. Given the confidential nature of each patients medical records, Relator cannot yet determine without discovery or a Court Order who else may have been involved in providing the false medical certifications. Because of medical privacy laws, such information is exclusively within the possession of Ghasseminejad and the Ghasseminejad Hospice Defendants, possibly Dr. Lavian and/or the defrauded government agencies.

48. Relator then looked up M.A. on Noridian. The results of this search confirm that M.A. was enrolled in hospice, for two different eligibility periods, April 4, 2020-July 22, 2020, and then July 23, 2020-September 21, 2020. A redacted version of the Noridian report for patient M.A., is attached hereto and incorporated herein as Exhibit C. Hospice enrollment is set forth near the end of the two-page exhibit. It reflects information such as the "Earliest Billing Activity" and "Latest Billing Activity," "Episode Effective Date" and Episode Termination Date," and whether the patient's hospice care enrollment was revoked or not.

49. Relator performed a similar review/investigation of other patients of his whose claims were denied.

50. Without resort to discovery or a Court Order, Relator currently cannot state which patients had their claims paid entirely through Medicare, Medicaid, or some combination of both, because information as to specific medical claims and billing information is statutorily protected from disclosure and as such is exclusively within Defendants' and/or the government's control.

**Ghasseminejad's Ownership and Control Of The Hospice Defendants**

51. At the times relevant herein, public records reveal that Ghasseminejad was either the sole shareholder of the hospice corporations or the Managing Member of the hospice limited liability companies. He also publicly identified himself at times as a director and officer for the Ghasseminejad Hospice Defendants.

52. California corporate records further confirm his role as they establish that Ghasseminejad formed, owned, served as CEO/CFO/Director/Secretary, and controlled the hospice entities identified herein. For instance, California Secretary of State corporate filings establish Ghasseminejad's positions in the following entities:

a. **Med Plus Hospice Care, Inc**. (Entity No. 3407842), incorp. 9/12/2011. CEO, CFO, Director, Secretary, Agent. Address: 17835 Ventura Blvd., Ste. 201, Encino, CA 91316. Status: Active.

b. **AIM Hospice Care, Inc**. (Entity No. 4572884), incorp. 3/2/2020. CEO, CFO, Director, Secretary, Agent. Address: 17835 Ventura Blvd., Ste. 106, Encino, CA 91316. Status: Suspended–FTB.

c. **VIP Hospice Care** (Entity No. 3517842), incorp. 11/7/2012. CEO, CFO, Director, Secretary, Agent. Address: 17835 Ventura Blvd., Ste. 210B, Encino, CA 91316. Status: Active.

d. **Relyable Hospice Care, Inc**. (Entity No. 3424200), incorp. 11/15/2011. CEO, CFO, Director, Secretary, Agent. Address: 17835 Ventura Blvd., Ste. 108, Encino, CA 91316. Status: Active.

e. **Millennium Hospice Care, Inc**. (Entity No. 3608491), incorp. 10/4/2013. CEO, CFO, Director, Secretary. Address: 17835 Ventura Blvd., Ste. 210A, Encino, CA 91316. Status: Suspended–FTB.

f. **Toluca Hospice Care, Inc**. (Entity No. 3597855), incorp. 8/21/2013. Ghasseminejad is Director. Behnam Ghasseminejad (his father) is CEO, CFO, Secretary. Address: 1146 N. Central Ave., Unit 240, Glendale, CA 91202. Status: Suspended–FTB.

g. **Blue Heaven Hospice and Palliative Care, Inc**., listing Ghasseminejad as their CRA as late as August 2023.

53. Although Relator has not yet identified any of his patients that were enrolled with other Ghasseminejad controlled hospice entities, public records reflect that there were many others, including: Especial Care Hospice Inc (Entity No. 3455683, CEO/CFO/Director/Secretary); Grove Hospice Care, Inc. (Entity No. 4572891, CEO/CFO/Director/Secretary); Golden Hills Healthcare Services, Inc. (Entity No. 2394478, CEO/CFO/Director/Secretary); and KBG Med Clinic (NPI: 1669966651, “President” per the NPI Registry).

54. Plaintiff is informed and believes and based thereon alleges, that Ghasseminejad engaged in efforts to conceal his fraudulent conduct, while maintaining centralized control of the entities, by applying for and using multiple NPI numbers. Most of these entities operated from one of two of his Encino, California addresses: 17835 Ventura Boulevard or 16200 Ventura Boulevard, Suite 301, Encino, California.

55. Ghasseminejad’s business activities were not limited to hospice companies. After the filing of the initial complaint, Ghasseminejad put one of his non-hospice entities into a Chapter 11 Bankruptcy before the United States Bankruptcy Court Central District of California (Case No. 1:23-bk-10966-VK). The debtor was identified as K3B Enterprises, LLC (“K3B) (ECF Doc. #1). The Petition reflects that K3B’s principal place of business was located at 16200 Ventura Blvd., Suite 301, Encino, CA, the same address that appears to be the offices for most of the Ghasseminejad Hospice Defendants. The Petition also confirms under oath that Ghasseminejad owned 100% of the debtor entity (ECF Doc. # 1 page 6 of 13). The Petition and related schedules confirm that K3B’s sole asset was a luxury residence located at 9996 Sunset Blvd., Beverly Hills, CA.

56. On July 10, 2023, Ghasseminejad appeared at K3B’s initial meeting of creditors (11 U.S.C. § 341a) and testified under oath. During the examination, he

identified himself as the sole Member and that the Beverly Hills residence was his personal residence. When he was asked about how he was paying for the residence, he testified that his hospice companies had been generating approximately $1 million per month. He further admitted that he was personally using those funds to service the debt on his residence. These admissions demonstrate his direct financial control over, and personal financial benefit, from the revenues generated by his hospice scam.

57. Further, in the bankruptcy case, Preferred Bank which made two loans secured by the residence, sought relief from the automatic stay to foreclose on the residence (ECF Doc. # 40-1). In support of their motion, Preferred Bank attached various loan documents including a Promissory Note, which was executed by Ghasseminejad as the owner of the following signatory hospice companies that are named in this action: VIP Hospice, Millenium Hospice, Blue Heaven Hospice and Toluca Hospice. Each of those hospice companies signed the loan as borrowers. In each such instance, Ghasseminjad signed for them as either the Managing Member for the limited liability company entity or as its Chief Executive Officer for the corporate entity. He also **<u>personally</u>** guaranteed the debt which was, according to the filing, approximately $10 million at that time. Attached hereto as Exhibit D and E are a true and correct copies of the Promissory Note and Guaranty signed by Ghasseminejad.

58. The foregoing facts establish that Ghasseminejad was not merely a proxy for someone else, a passive shareholder or member. At all relevant times, he owned, managed, and exercised operational control over the Ghasseminejad Hospice Defendants and their Medicare and Medi-Cal billing operations and had use of their revenue. As the sole owner, chief executive officer, managing member, and/or principal officer of those entities, he exercised authority over Medicare enrollment, maintenance of billing privileges, patient admissions, billing operations, corporate finances, and the accounts into which government reimbursements were deposited.

Because the submission of Medicare hospice claims necessarily required provider enrollment, maintenance of billing privileges, supervision of billing personnel, and control over the entities' financial operations, those functions were within Ghasseminejad's exclusive authority.

59. Accordingly, based upon the foregoing facts, the results of Relator's investigation, the Noridian Medicare Portal records, public corporate records, bankruptcy filings, sworn testimony, and Ghasseminejad's admissions concerning his personal use of hospice revenues, Relator alleges that Ghasseminejad knowingly executed, authorized, directed, approved, or caused the submission of the Medicare and Medi-Cal hospice Medical Certifications and reimbursement claims described in this Complaint.

60. To the extent any other person was involved in the Medical Certification or reimbursement claim process, such individuals acted under Ghasseminejad's express direction and authority as an employee, co-conspirator, aider and abettor, agent, or proxy; thus, Ghasseminejad remains primarily liable for their actions. As to these other individuals, Relator cannot currently identify them without resorting to discovery because this information is potentially covered by healthcare privacy laws and as such is exclusively within the control of the hospice companies including the Ghasseminejad Defendants and possibly Medicare and Medi-Cal, none of whom will voluntarily, or in the case of the government entities, can lawfully release this information without discovery, subpoena or Court Order. Nonetheless, regardless of who may have also been involved, the facts alleged herein establish that Ghasseminejad authorized or caused their submission.

## CLAIMS FOR RELIEF

## COUNT I – FALSE CLAIMS ACT: ILLEGAL CLAIMS FOR PAYMENT

61. Relator repeats and realleges each allegation contained in paragraphs 1 through 60 above as if fully set forth herein.

////

62. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

63. The Defendants, by and through their officers, agents, employees, related companies, subsidiaries and holding companies knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) (2010).

64. The Defendants, by and through its officers, agents, and employees authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

65. As a result of the acts of Defendants, the United States Government reimbursed the Defendants for medically unnecessary hospice care, services, and per diems that it otherwise would not have paid.

66. Every statement, billing and claim for payment submitted to the federal health insurance programs for each and every hospice patient who was not terminally ill with a prognosis of six months or less to live, if the illness runs its usual course or retained in hospice care after recovery, substantial improvement and a new prognosis or who was otherwise disqualified from hospice care represents a false or fraudulent claim for payment.

67. By reason of Defendants' acts the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Federal health insurance programs have paid for thousands of days of hospice care and costs that they otherwise would not have paid for but for Defendants' fraudulent and illegal conduct.

68. As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 et seq. and have thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

**WHEREFORE**, Relator respectfully requests this Court enter judgment against Defendants, as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b. That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

d. That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

e. That the Court award such other and further relief as it deems proper.

## COUNT II – FALSE CLAIMS ACT: FALSE RECORDS OR STATEMENTS

69. Relator repeats and realleges each allegation contained in paragraphs 1 through 60, above as if fully set forth herein.

70. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

71. The Defendants, by and through its officers, agents, employees, related companies, subsidiaries and holding companies knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) (2010).

72. As set forth in the preceding paragraphs, Defendants' provision of hospice care to unqualified patients defrauded the United States by getting false and/or fraudulent Medicare and other Government healthcare claims paid in violation of 31 U.S.C. § 3729(a)(1)(C) (2010).

73. The Defendants, by and through its officers, agents, and employees authorized and encouraged the actions of its various officers, agents, and employees to take the fraudulent actions set forth above.

74. As a result of the acts of Defendants, the United States Government reimbursed Defendants for hospice care that it otherwise would not have paid.

75. Every statement, billing and claim for payment submitted to the federal health insurance programs for each and every patient who received hospice care which failed to meet the admission and retention rules and criteria was medically unnecessary and represents a false or fraudulent statement.

76. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

77. As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 et seq. and has thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

**WHEREFORE**, Relator respectfully requests this Court enter judgment against Defendants, as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b. That civil penalties of $11,000 be imposed for each and every false claim that Defendant(s) caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

////

d. That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

e. That the Court award such other and further relief as it deems proper.

## COUNT III – FALSE CLAIMS ACT: CONSPIRACY TO PRESENT ILLEGAL CLAIMS FOR PAYMENT, PRESENT FALSE RECORDS

78. Relator repeats and realleges each allegation contained in paragraphs 1 through 60 above as if fully set forth herein.

79. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

80. The Defendants, by and through their officers, agents, employees, related companies, subsidiaries and holding companies knowingly conspired to present or cause to be presenting, a false or fraudulent claim for payment or approval and false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(A) (2010).

81. The Defendants, by and through its officers, agents, and employees conspired, authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

82. As a result of the acts of Defendants, the United States Government reimbursed the Defendants for medically unnecessary hospice care, services, and per diems that it otherwise would not have paid.

83. Every statement, billing and claim for payment, record or statement submitted to the federal health insurance programs for each and every hospice patient who was not terminally ill with a prognosis of six months or less to live, if the illness runs its usual course or retained in hospice care after recovery, substantial improvement and a new prognosis or who was otherwise disqualified from hospice care represents a false or fraudulent claim for payment.

84. By reason of Defendants' acts the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Federal

health insurance programs have paid for thousands of days of hospice care and costs that they otherwise would not have paid for but for Defendants' fraudulent and illegal conduct.

85. As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 et seq. and have thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

**WHEREFORE**, Relator respectfully requests this Court enter judgment against Defendants, as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b. That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

d. That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

e. That the Court award such other and further relief as it deems proper.

////

////

////

////

/////

## COUNT IV – CALIFORNIA FALSE CLAIMS ACT – GOVERNMENT CODE SECTION § 12652.

86. Relator, acting in the name of and on behalf of the State of California, restates and realleges each and every allegation contained in paragraphs 1 through 60 above as if each were stated herein in its entirety and said allegations are incorporated herein by reference.

87. This is a claim for treble damages and penalties under the California False Claims Act.

88. By virtue of the acts described herein, Defendants, for the purpose of defrauding the California State Government, knowingly presented, or caused to be presented false or fraudulent claims for payment or approval under Medi-Cal and other California State funded programs, and made, used and caused to be made and used false records and statements material to false claims.

89. Each claim for payment for an inadmissible hospice patient, or a patient who no longer qualified for hospice care or whose records were falsified represents a false or fraudulent claim for payment.

90. Each claim for payment for hospice care that contained false, inaccurate or deceptive billing codes or other false statements constitutes a false or fraudulent claim because such false claims are not covered by the California state healthcare programs.

91. The State of California, by and through its Medi-Cal program and other State healthcare programs, was unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants and paid and continues to pay the claims that would not be paid but for Defendants' wrongful actions and omissions.

92. As a result, California state monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

93. Therefore, the California State Government has been damaged in an amount to be proven at trial.

94. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from Defendants' conduct as described herein.

95. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to California's Government Code § 12652 on behalf of himself and the State of California.

**Defendant Ghasseminejad's Knowledge And Scienter**

96. Ghasseminejad specifically harbored the requisite knowledge and scienter.

a. He was sole CEO/CFO/Director/Secretary/Agent of the entities, with direct authority over all operations.

b. Many of the related entities all shared the same addresses (17835 and 16200 Ventura Blvd., Encino.

c. The Patients identified were manifestly not terminal and were not actually placed in hospice facilities or provided services.

d. The Fraud spanned 2018–2021 across multiple entities requiring central direction with connected addresses.

e. He had paid recruiters – who used gifts and false promises to recipients—showing a deliberate scheme to enroll ineligible patients for hospice services that were never intended to be provided.

f. Patients that were family members (MA, RT, FT) were placed in different entities to distribute claims across multiple facilities to help cover up the scam.

g. Ghasseminejad admitted under oath that he owned the hospice companies outright, and used millions of dollars from their revenue to invest in high

end luxury real estate located in Beverly Hills, California which was also his personal residence.

i. As the person in charge of all of these entities, Ghasseminejad knew for a fact his facilities did not actually have doctors or nurses to provide actual hospice services to the patients enrolled and did not have facilities for such services. He knew the patients enrolled were not in those facilities because he was in charge of the scheme.

97. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medi-Cal program.

**WHEREFORE**, Relator respectfully requests this Court enter judgment against Defendants, as follows:

a. That the State of California be awarded damages in the amount permitted by law;

b. That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the State's Medicaid or other Government Healthcare Programs under the California False Claims Act;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

d. That the Relator be awarded the maximum amount allowed pursuant to the California False Claims Act; and

////

////

////

////

////

e. That the Court award such other and further relief as it deems proper.

Attorneys for Plaintiff and Relator.

Dated: July 14, 2026

KNAPP, PETERSEN & CLARKE

By: [signature]
Mitchell B. Ludwig
Attorneys for Plaintiff and Relator
HARRY LIFSCHUTZ, M.D., an individual

KRAMER BROWN HUI LLP

By: /s/ Sam Brown
Sam Brown
Attorneys for Plaintiff and Relator
HARRY LIFSCHUTZ, M.D, an individual

KNAPP, PETERSEN & CLARKE

# EXHIBIT A

EXHIBIT A

**Relator's Patients Enrolled in Hospice**

| Patient Name | Enrolled Hospice Company | NPI Number | Dates of Enrollment | Patient's Medical Condition |
|---|---|---|---|---|
| G.B. | Blue Heaven Hospice and Palliative Care Inc. | 1518108950 | 9/7/2021 - 10/18/2021 | Varicose veins |
| I.E. | Blue Heaven Hospice and Palliative Care Inc. | 1518108950 | 2/15/2021 - 4/30/2021 | Arthritis |
| L.M. | Blue Heaven Hospice and Palliative Care Inc. | 1518108950 | 2/15/2021 - 7/31/2021 | Arthritis |
| F.T. | Gates to Paradise Hospice Care, Inc. | 1629346465 | 6/1/2020 - 9/30/2020 | Arthritis, hypertension |
| M.A. | Med Plus Hospice Care, Inc. | 1164707386 | 4/24/2020 - 9/21/2020 | Headaches (migraines) and arthritis |
| R.T. | Med Plus Hospice Care, Inc. | 1164707386 | 4/24/2020 - 9/21/2020 | Hernia, arthritis |
| S.M. | Med Plus Hospice Care., Inc. | 1164707386 | 4/7/2021 - 9/30/2021 | Arthritis |
| J.M. | Mount Olives Hospice | 1528468238 | 11/28/2020 - 2/25/2021 | Diabetes |
| C.S. | Mount Olives Hospice | 1528468238 | 11/28/2020 - 1/28/2021 | Depression, arthritis |
| F.G. | Relyable Hospice Care | 1548539463 | 11/16/2020 - 1/11/2021 | Diabetes, new diagnosis of parotid (a saliva gland) cancer |
| F.P. | Relyable Hospice Care | 1548539463 | 5/14/2021 - 10/31/2021 | Pain Mgt for back pain; some cardiac issues |
| L.G. | Thousand Oaks Hospice Care | 1952982365 | 3/20/2021 - 3/31/2021 | Arthritis |
| Z.P. | Thousand Oaks Hospice Care | 1952982365 | 9/19/2020 - 12/17/2020 | Knee arthritis |
| J.L. | Toluca Hospice Care, Inc. | 1710314752 | 03/07/2018 - 04/30/2018 | Vascular disease |
| F.L. | Toluca Hospice Care, Inc. | 1710314752 | 7/21/2020 - 10/18/2020 | Arthritis |
| H.L. | VIP Hospice Care | 1124364336 | 09/29/2021 10/31/2021 | Mild memory loss/dementia |
| A.M. | VIP Hospice Care | 1124364336 | 8/11/2020- 8/25/2020 | Non-Life Ending Medical Problems |

# EXHIBIT B

# Medicare Summary Notice
## for Part B (Medical Insurance)

The Official Summary of Your Medicare Claims from the Centers for Medicare & Medicaid Services

0014784 20201223 PL7QJ201 MN 2 2OZ DOM PL7QJ20000 * 002200 MM

[redacted]

**THIS IS NOT A BILL**

**Notice for** [redacted]

Medicare Number [redacted]

Date of This Notice **December 22, 2020**

Claims Processed Between **September 22 - December 21, 2020**

## Your Deductible Status

Your deductible is what you must pay for most health services before Medicare begins to pay.

## Be Informed!

Medicare eBooks – Fast and free information anywhere! View them on all types of eReaders, like an iPad or Kindle. New ones are added all the time! Go to https://www.medicare.gov/pub/ebook.

## Your Claims & Costs This Period

**Did Medicare Approve All Services?** **NO**

**Number of Services Medicare Denied** **4**

See claims starting on page 3. Look for NO in the "Service Approved?" column. See the last page for how to handle a denied claim.

**Total You May Be Billed** **$0.00**

## Facilities with Claims This Period

June 26, 2020
**Clinicas De Salud Del Pueblo In**

September 04, 2020
**Clinicas De Salud Del Pueblo In**

¿Sabía que puede recibir este aviso y otro tipo de ayuda de Medicare en español? Llame y hable con un agente en español.
如果需要国语帮助，请致电联邦医疗保险，请先说"agent"，然后说"Mandarin"。 1-800-MEDICARE (1-800-633-4227)

# Your Hospice Claims for Part A (Hospital Insurance)

Part A Inpatient Hospital Insurance helps pay for inpatient hospital care, inpatient care in a skilled nursing facility following a hospital stay, home health care, and hospice care.

## Definitions of Columns

**Service Approved?:** This column tells you if Medicare covered the Hospice service.

**Amount Provider Charged:** This is your provider's fee for this service.

**Medicare-Approved Amount:** This is the amount a provider can be paid for a Medicare service. It may be less than the actual amount the provider charged. Your provider has agreed to accept this amount as full payment for covered services. Medicare usually pays 80% of the Medicare-approved amount.

**Amount Medicare Paid:** This is the amount Medicare paid the provider. This is usually 80% of the Medicare approved amount.

**Maximum You May Be Billed:** This is the total amount the provider is allowed to bill you. This is usually $0, but can include copayments for outpatient prescription drugs, as well as 5% of the Medicare-approved amount for inpatient respite care. If you have Medicare Supplement Insurance (Medigap policy) or other insurance, it may pay all or part of this amount.

**September 01 - September 21, 2020**
**Med Plus Hospice Care, Inc., (626) 357-1300**
34 E Live Oak Ave, Ste B, Arcadia, CA 91006-5278
Referred by Cyrus R. Lavian

| Quantity & Service Provided | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| **21 Hospice/Rtn Home** | Yes | $2,876.46 | $2,876.46 | $2,966.78 | $0.00 | |
| 3 Skilled Nurs/Visit | | | | | | A |
| **Total for Claim #22028700337707CAR** | | $2,876.46 | $2,876.46 | $2,966.78 | **$0.00** | **B,C** |

## Notes for Claims Above

**A** Payment for this hospice service is included in the payment for the hospice daily level of care. You shouldn't be billed for this service.

**B** The amount Medicare paid the provider for this claim is $2,966.78.

**C** This information is being sent to Medicaid. They will review it to see if additional benefits can be paid.

# EXHIBIT C

0.0 /

## Eligibility Benefits Response

New Inquiry

Print Page

**Beneficiary:** M.A.
**Gender:** F
**DOB:** 04/17/1954
**Date of Death:**
**Medicare Number:** M.A.
**Transaction ID:** 316913717

**Provider/Supplier:** HARRYILIFSCHUTZ
**NPI:** 1013014752
**PTAN:** 00G428020
**TIN or SSN:** M.A.
**From Date of Service:** 02/03/2021
**To Date of Service:** 06/03/2022

**Related Inquiries**
View Claim Status

View All | Eligibility | HMO/MA | MSP | HHEH | Hospice | Hospital/SNF | ESRD | Preventive | MDPP

### Eligibility

**This patient has QMB for part of the date span chosen. The patient may or may not be responsible for the deductible depending on QMB status. Please contact the patient's Medicaid agency.**

#### Part A - Beneficiary Details

**Effective Date:** 04/01/2019 **Termination Date:**

**Entitlement Reason:** 0-Beneficiary insured due to age OASI

#### Part B - Beneficiary Details

**Effective Date:** 04/01/2019 **Termination Date:**

**Entitlement Reason:** 0-Beneficiary insured due to age OASI

#### Part B - Benefit Information

**Benefit Period:** 01/01/2022 - 12/31/2022 **QMB Enrolled:** Yes

**Base Deductible:** 0 **Remaining Deductible:** **Coinsurance Percentage:** 0

**Benefit Period:** 01/01/2021 - 12/31/2021 **QMB Enrolled:** Yes

**Base Deductible:** 0 **Remaining Deductible:** **Coinsurance Percentage:** 0

#### Ineligible Period

**Start Date:** **End Date:**

The beneficiary is ineligible for Medicare benefits for any one of the following reasons:

- Classified as unlawfully present in the United States.
- Deported from the United States
- Incarcerated

#### Beneficiary Address:

M.A.
CALEXICO, CA 922313821

#### Occupational Therapy Information

**Amount Used:** $0.00 **Benefit Year:** 2022

**Start Date:** 01/01/2022 **End Date:** 12/31/2022

### MSP

This patient has QMB for part of the date span chosen. The patient may or may not be responsible for the deductible depending on QMB status. Please contact the patient's Medicaid agency.

**Medicare Secondary Payer Benefit Information**

Eligibility information for this category is not on file on the date for this inquiry.

### HHEH

This patient has QMB for part of the date span chosen. The patient may or may not be responsible for the deductible depending on QMB status. Please contact the patient's Medicaid agency.

**Home Health Episode History Benefit Information**

**Payer Name:** National Government Services, Inc.

**Payer ID:** 06014

**Provider Number:** 1154568814

**Episode Start Date:** 03/12/2021

**Episode End Date:** 04/10/2021

**Earliest Billing Date:** 03/12/2021

**Latest Billing Date:** 04/05/2021

**Patient Status:** 01-Discharged to home or self care

**Payer Name:** National Government Services, Inc.

**Payer ID:** 06014

**Provider Number:** 1154568814

**Episode Start Date:** 02/10/2021

**Episode End Date:** 03/11/2021

**Earliest Billing Date:** 02/10/2021

**Latest Billing Date:** 03/11/2021

**Patient Status:** 30-Still patient

### Hospice

This patient has QMB for part of the date span chosen. The patient may or may not be responsible for the deductible depending on QMB status. Please contact the patient's Medicaid agency.

**Hospice Benefit Information**

**Date of Earliest Billing Activity:** 07/23/2020 **Date of Latest Billing Activity:** 09/21/2020

**Provider Number:** 1164707386

**Episode Effective Date:** 07/23/2020 **Episode Termination Date:** 09/21/2020

med. plus

**Number of Days used in this billed Episode:** 21

**Revocation Indicator:** Code 1: The beneficiary's hospice benefits are revoked.

**Date of Earliest Billing Activity:** 04/24/2020 **Date of Latest Billing Activity:** 07/22/2020

**Provider Number:** 1164707386

**Episode Effective Date:** 04/24/2020 **Episode Termination Date:** 07/22/2020

**Number of Days used in this billed Episode:** 0

**Revocation Indicator:** Code 1: The beneficiary's hospice benefits are revoked.

# EXHIBIT D

*##########%0955%05102019%#########*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | | | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $7,800,000.00 | 05-10-2019 | 05-10-2021 | | | 71 | | G L | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** K3B Enterprises, LLC; VIP Hospice Care; Millennium Hospice Care, Inc.; Blue Heaven Hospice & Palliative Care Inc.; and Toluca Hospice Care, Inc.
16200 Ventura Boulevard, Suite 301
Encino, CA 91436

**Lender:** Preferred Bank
Alhambra Office
325 East Valley Blvd.
Alhambra, CA 91801

**Principal Amount: $7,800,000.00** **Date of Note: May 10, 2019**

**PROMISE TO PAY.** K3B Enterprises, LLC; VIP Hospice Care; Millennium Hospice Care, Inc.; Blue Heaven Hospice & Palliative Care Inc.; and Toluca Hospice Care, Inc. ("Borrower") jointly and severally promise to pay to Preferred Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Million Eight Hundred Thousand & 00/100 Dollars ($7,800,000.00), together with interest on the unpaid principal balance from May 10, 2019, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 23 principal payments of $7,656.21 each and one final principal and interest payment of $7,663,615.02. Borrower's first principal payment is due June 10, 2019, and all subsequent principal payments are due on the same day of each month after that. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning June 10, 2019, with all subsequent interest payments to be due on the same day of each month after that. Borrower's final payment due May 10, 2021, will be for all principal and all accrued interest not yet paid. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal. Where a range of rates has been published, the index will be based on the higher rate. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 5.500% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.750 percentage points over the Index, rounded to the nearest percent, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.250%. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.**

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a **minimum interest charge of $200.00.** Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Preferred Bank, 9350 Flair Dr. Suite 425 EL MONTE, CA 91731.**

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 8.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this

*##########%0955%05102019%#########*

# PROMISSORY NOTE
## (Continued)



Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated May 10, 2019, to a trustee in favor of Lender on real property located in Los Angeles County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Borrower is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Borrower. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B) an Assignment of All Rents to Lender on real property located in Los Angeles County, State of California.

(C) a Commercial Security Agreement dated May 10, 2019 made and executed between K3B Enterprises, LLC and Lender on collateral described as fixtures.

**BUSINESS LOAN AGREEMENT.** Reference is hereby made to that certain Business Loan Agreement of even date for additional terms and conditions.

**SUPPORTING DOCUMENTS.** This loan is supported by a Commercial Guaranty of even date.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties,

*##########%0955%05102019%#########*

# PROMISSORY NOTE
## (Continued)



endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**K3B ENTERPRISES, LLC**

By: ______________________________
Kaysan Ghasseminejad, Manager/ Member of K3B Enterprises, LLC

**VIP HOSPICE CARE**

By: ______________________________
Kaysan Ghasseminejad, Chief Executive Officer of VIP Hospice Care

**MILLENNIUM HOSPICE CARE, INC.**

By: ______________________________
Kaysan Ghasseminejad, Chief Executive Officer of Millennium Hospice Care, Inc.

**BLUE HEAVEN HOSPICE & PALLIATIVE CARE INC.**

By: ______________________________
Kaysan Ghasseminejad, Chief Executive Officer of Blue Heaven Hospice & Palliative Care Inc.

**TOLUCA HOSPICE CARE, INC.**

By: ______________________________
Kaysan Ghasseminejad, Chief Executive Officer of Toluca Hospice Care, Inc.

LaserPro, Ver. 19.3.10.016 Copr. Finastra USA Corporation 1997, 2019. All Rights Reserved. - CA L:\NOTE\CFI\LPL\D20.FC TR-5724 PR-13

# EXHIBIT E

0.0 /

*##########%0220%05102019%#########*

# COMMERCIAL GUARANTY

**Borrower:** VIP Hospice Care; Millennium Hospice Care, Inc.; Blue Heaven Hospice & Palliative Care Inc.; Toluca Hospice Care, Inc.; Hollywood Health Services, Inc.; Med Plus Hospice Care, Inc.; and Relyable Hospice Care, Inc
16200 Ventura Boulevard, Suite 301
Encino, CA 91436

**Lender:** Preferred Bank
Alhambra Office
325 East Valley Blvd.
Alhambra, CA 91801

**Guarantor:** K3B Enterprises, LLC
16200 Ventura Boulevard, Suite 301
Encino, CA 91436

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower, or any one or more of them, to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, or any one or more of them, and any present or future judgments against Borrower, or any one or more of them, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER, OR ANY ONE OR MORE OF THEM, TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. Guarantor's obligations under this Guaranty shall be in addition to any of Guarantor's obligations, or any of them, under any other guaranties of the Indebtedness or any other person heretofore or hereafter given to Lender unless such other guaranties are modified or revoked in writing; and this Guarantor shall not, unless provided in this Guaranty, affect, invalidate, or supersede any such other guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of

*##########%0220%05102019%#########*

## COMMERCIAL GUARANTY
## (Continued)



this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Additional Requirements.**
**Guarantor's Financial Statements.** As soon as available, but in no event later than **thirty (30)** days after the end of each calendar year, Borrower shall cause Guarantor to provide a copy of their balance sheet, income and expense statement, in form satisfactory to Lender.

**Guarantor's Tax Returns.** As soon as available, but in no event later than **thirty (30)** days after filing and of each subsequent year, Borrower shall cause Guarantor to provide a signed copy of the Federal Income Tax Returns of Guarantor together with K-1's and all other schedules pertaining to the Tax Return, or a signed copy of each of the Request for Tax Return Extensions.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender to (A) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness; (B) proceed against any person, including Borrower, before proceeding against Guarantor; (C) proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Guarantor; (D) apply any payments or proceeds received against the Indebtedness in any order; (E) give notice of the terms, time, and place of any sale of the collateral pursuant to the Uniform Commercial Code or any other law governing such sale; (F) disclose any information about the Indebtedness, the Borrower, the collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or (G) pursue any remedy or course of action in Lender's power whatsoever.

Guarantor also waives any and all rights or defenses arising by reason of (H) any disability or other defense of Borrower, any other guarantor or surety or any other person; (I) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness; (J) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Guarantor and Lender; (K) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (L) any statute of limitations in any action under this Guaranty or on the Indebtedness; or (M) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate, and including any such modification or change in terms after revocation of this Guaranty on the Indebtedness incurred prior to such revocation.

Guarantor waives all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive.

Guarantor waives all rights and any defenses arising out of an election of remedies by Lender even though that the election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Guarantor waives all rights and defenses that Guarantor may have because Borrower's obligation is secured by real property. This means among other things: (N) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower. (O) If Lender forecloses on any real property collateral pledged by Borrower: (1) the amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price. (2) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's obligation is secured by real property. These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Guarantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Guarantor might otherwise be entitled under state and federal law. The rights and defenses waived include, without limitation, those

*##########%0220%05102019%#########*

# COMMERCIAL GUARANTY
## (Continued)



provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Guarantor acknowledges that Guarantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Guarantor further understands and agrees that this Guaranty is a separate and independent contract between Guarantor and Lender, given for full and ample consideration, and is enforceable on its own terms. Until all of the Indebtedness is paid in full, Guarantor waives any right to enforce any remedy Guarantor may have against the Borrower or any other guarantor, surety, or other person, and further, Guarantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Collateral.** Guarantor acknowledges this Guaranty is secured by the following collateral described in the security instruments listed herein:

1. a Deed of Trust dated May 10, 2019, to a trustee in favor of Lender on real property located in Los Angeles County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

2. an Assignment of All Rents to Lender on real property located in Los Angeles County, State of California.

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Guaranty:

**AMENDMENTS.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**ATTORNEYS' FEES; EXPENSES.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**CAPTION HEADINGS.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**GOVERNING LAW. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.**

**CHOICE OF VENUE.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**INTEGRATION.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**INTERPRETATION.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the

*##########%0220%05102019%#########*

# COMMERCIAL GUARANTY
## (Continued)



officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**NOTICES.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**NO WAIVER BY LENDER.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Definitions.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**BORROWER.** The word "Borrower" means VIP Hospice Care; Millennium Hospice Care, Inc.; Blue Heaven Hospice & Palliative Care Inc.; Toluca Hospice Care, Inc.; Hollywood Health Services, Inc.; Med Plus Hospice Care, Inc.; and Relyable Hospice Care, Inc and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**GUARANTOR.** The word "Guarantor" means everyone signing this Guaranty, including without limitation K3B Enterprises, LLC, and in each case, any signer's successors and assigns.

**GUARANTY.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**INDEBTEDNESS.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**LENDER.** The word "Lender" means Preferred Bank, its successors and assigns.

**NOTE.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED MAY 10, 2019.**

**GUARANTOR:**

**K3B ENTERPRISES, LLC**

By:______________________________
Kaysan Ghasseminejad, Manager/ Member of K3B Enterprises, LLC

LaserPro, Ver. 19.1.10.018 Copr. Finastra USA Corporation 1997, 2019 All Rights Reserved - CA L:\NOTE\CFI\LPL\E20.FC TR-5735 PR-13