Mitchell B. Ludwig, Bar No. 115903
mbl@kpclegal.com
KNAPP, PETERSEN & CLARKE
550 North Brand Boulevard, Suite 1500
Glendale, California 91203-1922
Telephone: (818) 547-5000
Facsimile: (818) 547-5329

Sam Brown, Bar No. 308558
sam@kbhllp.com
KRAMER BROWN HUI LLP
3600 Wilshire Blvd., Ste. 1908
Los Angeles, CA 90010
Telephone: (213) 310-8301
Facsimile (213) 310-8302

Attorneys for Plaintiff
HARRY LIFSCHUTZ, M.D., an individual

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF CALIFORNIA EX REL. HARRY LIFSCHUTZ, M.D., an individual,<br><br>Plaintiff,<br><br>v.<br><br>KAYSAM GHASSEMINJEAD, et al.<br><br>Defendants. | **Case No. 2:21-cv-05328-MWC-MAR**<br><br>RELATOR'S OPPOSITION TO MOVING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT<br><br>Date: September 11, 2026<br>Time: 1:30 p.m.<br>Dept: 6A<br><br>Hearing Judge: Hon. Michelle Williams Court |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 5

II. STATEMENT OF FACTS ..... 7

A. Hospice Eligibility Requirements and Medicare Claims Procedures ..... 7

B. The Scheme ..... 8

C. Relator's Knowledge and Investigation ..... 8

D. Patient M.A.—A Representative Claim Pled in Detail 9

E. All Moving Defendants Are Specifically Implicated in the Fraud ..... 10

III. PROCEDURAL HISTORY ..... 11

IV. LEGAL STANDARD ..... 11

A. Rule 12(b)(6): Motion to Dismiss ..... 11

B. Rule 9(b): Heightened Standard of Pleading Applicable to FCA Claims. ..... 11

V. ARGUMENT ..... 12

A. The SAC Pleads Actionable False Claims With Particularity and Reliable Indicia of Actual Submission ..... 12

B. The SAC Adequately Pleads Scienter ..... 24

C. The SAC Pleads Particularized, Defendant-Specific Conduct and Satisfies Rule 9(b) ..... 25

D. The SAC Pleads a False Records Claim (Count II) 26

E. The SAC Adequately Pleads an FCA Conspiracy (Count III) ..... 27

F. The California False Claims Act Claim (Count IV) Is Adequately Pleaded. ..... 27

G. The Court Should Reject Defendants' Improper Factual Attacks on Exhibit B and on Relator's Character 28

H. Dismissal With Prejudice Is Not Warranted ..... 29

VI. CONCLUSION ..... 29


KNAPP, PETERSEN & CLARKE

# TABLE OF AUTHORITIES

## Cases

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990) .................. 11

*Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) .................. 12

*Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019) .................. 12

*Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012) .................. 12

*In re Finjan Holdings, Inc. Sec. Litig.*, 58 F.4th 1048, 1055 (9th Cir. 2023) .................. 28

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) .................. 28

*Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) .................. 29

*Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) .................. 17

*Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) .................. 29

*U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) .................. 13

*United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) .................. 26

*United States ex rel. CA Challenger LLC v. Emanate Health*, No. 2:22-cv-04168-SVW-GJS, 2024 U.S. Dist. LEXIS 158049, *10–11 (C.D. Cal. Sept. 3, 2024) .................. 13

*United States ex rel. Everest Principals, LLC v. Abbott Laboratories, Inc*. 622 F.Supp.3d 920, 931-33 (S.D. Cal. 2022) .................. 21

*United States ex rel. Grubbs. v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) .................. 22

*United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1407 (C.D. Cal. 2014) .................. 15

*United States ex rel. STF, LLC v. Vibrant Am., LLC*, No. 16-cv-02487-JCS, U.S. Dist. LEXIS 150345, at *40-43 (N.D. Cal. Aug. 19, 2020) .................. 22

*United States v. Azar*, No. 2:20-cv-02450-MEMF-PJW, 2024 U.S. Dist. LEXIS 104745 (C.D. Cal. June 11, 2024) .................. 22

*United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) .................. 12

*United States v. Somnia, Inc.*, No. 1:15-cv-00433-DAD-EPG, 2018 U.S. Dist. LEXIS 17667, at *15 (E.D. Cal. Feb. 2, 2018) .................. 13

*United States v. United Healthcare Insurance Company*, 848 F.3d 1161, 1180 (9th Cir. 2016) .......... 11

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) .......... 24

**Statutes**

31 U.S.C. § 3729 .......... 12

42 U.S.C. § 1395y(a)(1)(A) .......... 7

Fed. R. Civ. P. 8(a)(2) .......... 11

Fed. R. Civ. P. Rule 9(b) .......... 11

**Regulations**

42 C.F.R. § 418.116 .......... 7

42 C.F.R. § 418.24 .......... 7

42 C.F.R. § 418.26(a) .......... 7

42 C.F.R. § 418.301 .......... 7

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants Kaysan Ghasseminejad, Med Plus, Relyable Hospice Care, Inc., and VIP Hospice Care, Inc. (the "Moving Defendants" or "Defendants") motion to dismiss the Second Amended Complaint ("SAC") asks the Court to commit reversible error and to allow Defendants to escape the repercussions of blatant fraud on the government. Moving Defendants do so by urging the Court to apply a level of scrutiny at the pleading stage that is not supported by Rule 12, Rule 9, and controlling case law. Plaintiff has described in sufficient detail the alleged scheme and Defendants' part therein. Notwithstanding the settled rule that a plaintiff need not know and plead every evidentiary fact, detail, or circumstance of defendant's fraud, Moving Defendants' Motion rests on precisely that untenable premise.

The Court dismissed the First Amended Complaint ("FAC") with leave to amend, identifying specific, discrete deficiencies: the FAC described a hospice-fraud scheme generally but lacked "sufficient indicia of reliability" that false claims were actually submitted; it stated billing figures for only two patients without explaining how Relator learned them; it blurred Medicare and Medi-Cal without differentiating the payors or explaining why no differentiation was possible; it rested on information and belief without pleading a factual basis for that belief; it alleged Ghasseminejad's role only through officer titles; and it failed to plead particularized conduct as to each defendant, including VIP. *See* Dkt. No. 189 at 8–9.

As argued in more detail below, the SAC cures each defect. Most importantly, the SAC no longer describes the scheme "generally." It now pleads a concrete, paid false claim, corroborated by a government document attached to the pleading, and walks the Court through the step-by-step process of how Relator came to discover the fraudulent scheme. Specifically, Exhibit B — a Medicare Summary Notice for Relator's patient M.A. — shows that Med Plus Hospice Care, Inc. submitted a hospice claim for M.A. for the period September 1 through September 21, 2020,

bearing claim number 22028700337707CAR, referred by Cyrus R. Lavian, M.D., and that Medicare paid Med Plus $2,966.78 for that claim. SAC ¶ 47 (Second Amended Complaint at 14; Second Amended Complaint at 33). These facts are alleged by Relator and are consistent with the document. *Id.* Relator, M.A.'s treating physician, alleges that the service was never provided and that M.A. — whom Relator treated for migraines and arthritis — was not terminally ill and never saw Dr. Lavian. SAC ¶¶ 40, 47. In pleading, Relator has provided the "reliable indicia" allegations required under *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010) and *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201 (9th Cir. 2019): an identified claim, an identified payor, an identified amount paid, an identified provider, and specific dates — precisely the detail the Court found missing.

The SAC likewise explains, in detail, how Relator — an insider as to his own patients' medical conditions — learned what he alleges: through payment-denial notices, patients' Explanation of Benefits, the official Noridian Medicare Portal, communications with pharmacies and home-health agencies, and interviews of the patients themselves. SAC ¶ 44. It differentiates each Moving Defendant through Exhibit A, which ties each named patient to a specific hospice entity, that entity's National Provider Identifier ("NPI"), specific enrollment dates, and the patient's non-terminal condition. SAC ¶ 37 & Ex. A (Second Amended Complaint at 11). And it pleads Ghasseminejad's knowledge and personal participation not merely through titles, but through his sworn bankruptcy testimony that his hospice companies generated roughly $1 million per month, which he personally used to service the debt on his Beverly Hills residence. SAC ¶ 56 (Second Amended Complaint at 18).

Defendants' remaining arguments ask the Court to do what Rule 12(b)(6) forbids: to disregard a government record attached to the complaint because it is allegedly "incomplete," and to weigh Relator's credibility by taking judicial notice of

his Medical Board disciplinary history for the truth of its contents[1]. As argued below, the Ninth Circuit squarely prohibits both. The motion should be denied.

## II. STATEMENT OF FACTS

### A. Hospice Eligibility Requirements and Medicare Claims Procedures

A Medicare patient is eligible for hospice only if diagnosed as terminally ill with a prognosis of less than six months to live, were the illness to run its natural course. 42 C.F.R. § 418.24; 42 U.S.C. § 1395x(dd)(3)(A); SAC ¶ 23. Enrollment in hospice results in a waiver of all other Medicare benefits during the period of election. 42 C.F.R. § 418.24; SAC ¶ 24.

The Medicare per diem payment to hospice providers is approximately $199 per day per enrolled patient. 42 C.F.R. § 418.301 *et seq.*; SAC ¶ 25. Hospice providers must comply with all federal, state, and local laws and regulations related to the health and safety of patients, 42 C.F.R. § 418.116; SAC ¶ 28, and must complete initial comprehensive assessments, 42 C.F.R. § 418.54; SAC ¶ 25, and reassessments, 42 C.F.R. § 418.54(d); SAC ¶ 26. When a patient is no longer terminally ill, hospice care must be terminated and the patient discharged. 42 C.F.R. § 418.26(a); SAC ¶ 27. Under 42 U.S.C. § 1395y(a)(1)(A), no payment may be made under the Medicare statute for items or services that are not reasonable and necessary for the diagnosis or treatment of illness. SAC ¶ 20. Medicare requires the submission of documented and properly coded claims that include the implied or express representation that the treatment provided was medically necessary. SAC ¶ 21. Medi-Cal is California's Medicaid program, financed equally by the state and federal governments and covering low-income individuals. SAC ¶ 22.[2]

---

[1] Defendant does not even attempt to link the irrelevant details concerning Relator's medical board discipline to the matters currently before the Court. Defendant and out of state defense counsel's decision to include them in a pleadings motion is thus troubling and nothing more than an improper attack on Relator's character.

[2] SAC, Ex. B reflects potential payments to Medi-Cal (See Footnote "C") at Dkt. 190, p. 34 of 35.)

**B. The Scheme**

Relator Harry Lifschutz, M.D., is a California-licensed physician and the treating physician ("PCP") for the patients at issue. SAC ¶ 3. The SAC alleges a common scheme: paid recruiters—including individuals known as "Tina," "Angelica," and "Guillermo A. Ramirez"—solicited elderly, often non-English-speaking patients, obtained their Medicare numbers in exchange for gifts (diapers, walkers, scooters) and false promises that they need not "change your health plan to receive these benefits," and passed those Medicare numbers to shady "hospice" companies for a kickback or referral fee. SAC ¶¶ 33–34. The hospice companies then obtained a fraudulent Medical Certifications from a physician who never saw the patient, enrolled the patient in hospice, and billed the government per diem, displacing the patient's regular Medicare coverage and treating physician. SAC ¶¶ 34–35. The hospice companies did not provide any hospice services to these individuals, none of whom were eligible anyways. SAC ¶¶ 36, 40; 42-44.

**C. Relator's Knowledge and Investigation**

Beginning in 2020, Relator noticed that bills he was submitting to Medicare and Medi-Cal for legitimate medical care he was providing to patients were denied because, according to the government programs, these patients had been enrolled in hospice during the time he provided the care, and as such the services were non-reimbursable unless performed by the treating hospice physician. SAC ¶ 38. Relator knew, because he was their treating physician, that none of these patients were eligible for, or receiving, hospice services. SAC ¶¶ 37–39; 44. Relator was concerned and investigated by (a) reviewing patients' Explanation of Benefits ("EOBs") provided to him by patients; (b) reviewing his own billing records; (c) reviewing patient records through the Noridian Medicare Portal, the official CMS platform that identifies the submitting hospice provider by NPI, the enrollment periods, and the dates of payment for a given patient; (d) contacting the supposed hospice companies by phone; (e) communicating with pharmacies and home-health agencies; and (f)

interviewing his own patients, ***none of whom knowingly enrolled in hospice nor received hospice services.*** SAC ¶¶ 30, 44. As the patients' PCP, and based on his personal treatment of them, Relator knew first hand, and alleges on the basis of that first-hand knowledge that none of is enrolled patients were terminally ill or otherwise eligible for hospice, and that none actually received hospice services. SAC ¶¶ 40, 43.

### D. Patient M.A.—A Representative Claim Pled in Detail

The SAC pleads a specific, representative claim in detail, related to one of his patients M.A. who was fraudulently enrolled in hospice by Defendant Med Plus Hospice Care, Inc. Patient M.A.'s Medicare Summary Notice reflects that Med Plus Hospice Care, Inc. submitted a hospice claim for M.A. for September 1–21, 2020 (claim no. 2202XXXXXXX07CAR), that the claim was "referred by Cyrus R. Lavian," and that "[t]he amount Medicare paid the provider for this claim is $2,966.78." SAC ¶ 47 & Ex. B. The same notice denied Relator's own legitimate claims for medical services provided to M.A. because, "[a]ccording to Medicare hospice requirements, this service is not covered because the service was provided by a non-attending physician." SAC ¶¶ 41, 46-48; Ex. B. In other words, only Dr. Lavian—the physician who fraudulently certified (or whose identity was used to fraudulently certify) could now be approved for these medical services. SAC ¶¶, 24; 47; Ex. A.

This was a crucial fact—that Relator's claims were being denied because Medicare regulations place tight controls on the type of care a patient who is currently receiving a hospice benefit can receive and be paid by Medicare. In this instance, M.A. would have to have treatment performed by Dr. Lavian. SAC ¶ 24; 47; Ex. B. Importantly, Dr. Lavian's practice is in the San Fernando Valley, more than 200 miles from M.A.'s residence in Calexico, and M.A. never saw him. SAC ¶ 47. The Noridian portal confirms M.A.'s hospice enrollment for two eligibility periods in 2020. SAC ¶ 48 & Ex. C. Relator treated M.A. directly and knew he was not in hospice, receiving hospice care, nor was he eligible for such care. SAC ¶¶ 40-

41, 44(f); 46-47; *see also id.* at 37; Ex. A. As such, for M.A. and each of the other patient's identified in the SAC, Relator determined that they had been enrolled in one of the Defendant hospices, hospice benefits had been paid, and that the patient was not eligible for and did not receive any such benefits.[3] SAC ¶¶ 24; 34-49; Ex. A.

### E. <u>All Moving Defendants Are Specifically Implicated in the Fraud</u>

Exhibit A lists each of Relator's patients whom he discovered to be fraudulently enrolled in one of the moving Defendant hospice companies--by initials, the enrolling hospice entity, that entity's NPI, the enrollment dates, and the non-terminal condition for which Relator treated the patient. SAC ¶ 37, Ex. A. Among the Moving Defendants: Med Plus (NPI 1164707386) enrolled M.A., R.T., and S.M.; Relyable Hospice Care (NPI 1548539463) enrolled F.G. (diabetes and a new parotid-cancer diagnosis) and F.P. (back pain); and VIP Hospice Care (NPI 1124364336) enrolled H.L. (mild memory loss/dementia; 9/29/2021–10/31/2021) and A.M. (8/11/2020–8/25/2020). SAC ¶ 37, Ex. A.

Defendant Ghasseminejad controlled and owned these entities. California Secretary of State records establish that he formed, owned, and served as CEO/CFO/Director/Secretary/Agent of the hospice entities, including Med Plus, VIP, and Relyable. SAC ¶¶ 51–52. Beyond titles, in a 2023 bankruptcy proceeding concerning his wholly owned entity K3B Enterprises, LLC, Ghasseminejad testified under oath that his hospice companies generated approximately $1 million per month, which he personally used to service the debt on his Beverly Hills residence, SAC ¶¶ 55–56; and he signed a Preferred Bank promissory note as owner/CEO/managing member for VIP, Millennium, Blue Heaven, and Toluca, and personally guaranteed roughly $10 million in debt, SAC ¶ 57. The SAC alleges that, as the person in charge of the entities, Ghasseminejad knew his facilities had no doctors, nurses, or facilities to provide hospice services and knew the enrolled

---

[3] *See* SAC Ex. B reflecting payment requests submitted to **<u>both</u>** Medicare and Medi-Cal.

patients were not receiving such services. SAC ¶¶ 58–59, 96.

## III. PROCEDURAL HISTORY

Relator filed this qui tam action under seal in 2021; the United States and California declined to intervene. Dkt. No. 189 at 1. Defendants moved to dismiss the original Complaint; Relator filed the FAC; Defendants moved to dismiss the FAC; and on June 24, 2026, the Court granted that motion with leave to amend, identifying the deficiencies described above. Dkt. No. 189. Relator filed the SAC on July 15, 2026. The Moving Defendants now move to dismiss the SAC. Dkt. No. 191.

## IV. LEGAL STANDARD

### A. Rule 12(b)(6): Motion to Dismiss

On a motion to dismiss, the court must accept as true all facts alleged in the complaint, and all inferences reasonably drawn from those facts must be construed in favor of the responding party. *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). The Court should grant the motion only if, taking all facts as true and drawing all reasonable inferences, the plaintiff fails to state a claim. *See id.*

### B. Rule 9(b): Heightened Standard of Pleading Applicable to FCA Claims.

Federal pleading rules call for a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Claims under the False Claims Act are also subject to Fed. R. Civ. P. Rule 9(b). *United States v. United Healthcare Insurance Company*, 848 F.3d 1161, 1180 (9th Cir. 2016). Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means alleging the "who, what, when, where, and how of the misconduct charged," *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010), including what is false or misleading about a statement, and why it is false, *id.* Knowledge, however, may be pled generally. *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011).

"Allegations of fraud must be specific enough to give defendants notice of the

particular misconduct which is alleged to constitute the fraud charged so they can defend against the charge and not just deny that they have done anything wrong." *United Healthcare Ins.*, 848 F.3d at 1180. Critically, to state an FCA claim a relator is *not required* to identify actual examples of submitted false claims; "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019) (quoting *Ebeid*, 616 F.3d at 998); *see also Ebeid*, 616 F.3d at 998 (a complaint need not "identify representative examples of false claims to support every allegation").

## V. ARGUMENT

### A. <u>The SAC Pleads Actionable False Claims With Particularity and Reliable Indicia of Actual Submission</u>

The False Claims Act makes liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). A plaintiff must show "(1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012).

#### 1. Falsity is pled with particularity.

The SAC alleges that Defendants submitted claims for reimbursement of hospice services for patients who were not eligible and/or never received hospice services. SAC ¶¶ 34–35, 40–45. Such claims are false. *See, e.g., United States ex rel. CA Challenger LLC v. Emanate Health*, No. 2:22-cv-04168-SVW-GJS, 2024 U.S. Dist. LEXIS 158049, *10–11 (C.D. Cal. Sept. 3, 2024); *see also United States v. Somnia, Inc.*, No. 1:15-cv-00433-DAD-EPG, 2018 U.S. Dist. LEXIS 17667, at *15 (E.D. Cal. Feb. 2, 2018) (quoting *U.S. ex rel. Conner v. Salina Reg'l Health Ctr.,*

KNAPP, PETERSEN & CLARKE

*Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008)).

Relator sufficiently pleads the details of falsity using both a false scheme with reasonable indicia and, notwithstanding that there is no requirement that he identify a specific representative claim. Relator has pled the scheme: that through paid recruiters, and via false medical certifications, the hospice providers were able to enroll patients who were not eligible for hospice and who never received any hospice services. SAC ¶¶ 33-35.

Relator also pleads in detail how he came to be aware of the scheme and the factual details thereof. Specifically, Relator encountered patients in his own practice and treated them various non-terminal conditions. SAC ¶¶ 37-38, 43-44; Ex. A. On the basis of his encounters with his patients he knew none were hospice-eligible or receiving hospice care. SAC ¶¶ 37-38, 40, 42-44. Relator later came to know Defendants nevertheless had enrolled them in hospice and obtain reimbursements as a result. SAC ¶¶ 38–43. Relator learned of the enrollments because his claims for legitimate care were being denied, because under Medicare rules all other Medicare benefits are waived during the time of hospice election. SAC ¶¶ 24; 38; 46. Relator investigated by interviewing his patients, reviewing patient EOBS, and reviewing the Noridian portal and confirm many of his non-terminal patients had indeed been enrolled in hospice and Medicare had paid for those benefits. *See* SAC ¶¶ 38-45. Based on Medicare regulations, to enroll Relator's patients in hospice, Defendants were required to represent them as hospice-eligible because Medicare hospice eligibility requires certification that the patient is terminally ill. 42 C.F.R. § 418.20(b). Because none of Relator's patients were hospice eligible nor were they receiving any hospice services, this representation was false, and resulted in payments from the government to Defendants. *See* SAC ¶¶ 23–28; 37-44.

Relator also pled a specific example of a patient, with specific enrollment dates, a specific NPI number, a specific amount, and a specific claim number. SAC ¶ 46-48. He also pled the process by which he obtained that information. *Id.* ¶¶ 44, 46-

KNAPP, PETERSEN & CLARKE

48. Taken together, these allegations are sufficient to satisfy both Rule 12 and Rule 9, and thereafter move Relator's case into discovery.

**2. The SAC cures each falsity deficiency identified in the Court's June 24, 2026 Order.**

The Court granted Defendant's Motion to Dismiss the FAC on falsity grounds and granted leave to amend. *See* Dkt No. 189. The Court found that the FAC's falsity allegations lacked "sufficient indicia of reliability" for three reasons: (1) Relator did not explain how he learned the billing amounts and enrollment periods he listed; (2) Relator did not sufficiently differentiate Medicare from Medi-Cal; and (3) Relator made many of his allegations on information and belief. Dkt. No. 189 at 8. As explained below, the SAC cures each defect.

First, the SAC no longer rests on unexplained billing figures or enrollment periods—it identifies an actual example of paid claim and explains precisely how Relator learned about the paid claim. SAC ¶ 41, 44-48. Relator attaches and pleads the details of a M.A. Medicare Summary Notice (Exhibit B) that shows the submitting provider (Med Plus), the claim number, the service dates, the referring physician (Dr. Lavian), and the amount Medicare paid ($2,966.78) including footnote C indicating that Medi-Cal would be sent the billing to determine their share. SAC ¶ 41, 47-49, Ex. B. Relator explains that he obtained this information because his own legitimate claims were denied, the denial notices identified hospice enrollment, he interviewed his patients, reviewed a Medicare Summary Notice (Ex. B) and confirmed enrollment and billing through the Noridian Medicare Portal. SAC ¶¶ 38–41, 44, 48. These are well-pled facts that should be tested in discovery—not discarded at the pleading stage. Relator supplies similar detail about various patients, at least one of which was enrolled by each of the entity Defendants who have brought this motion. SAC ¶¶ 37, 43, 49, Ex. A.

Further, the SAC does differentiate between the government program payors Medicare and Medi-Cal to the extent Relator reasonably can do so without discovery.

*See e.g.*, Ex. B. More importantly, the Relator explains why it is impossible to determine the precise source of each dollar of each claim at this stage. SAC ¶ 50. To be clear, the M.A. claim is pled as a Medicare claim, documented by a Medicare Summary Notice. SAC ¶ 47 & Ex. B (it also acknowledges that the billing would be submitted to Medi-Cal in footnote C). As to the balance of the claims, the SAC alleges that Relator "currently cannot state which patients had their claims paid entirely through Medicare, Medicaid, or some combination of both" because that billing information is statutorily protected and "exclusively within Defendants' and/or the government's control." SAC ¶ 50. That is not the unexplained blurring the Court identified; it is a pleaded explanation of why the precise payor allocation lies in Defendants' and the government's own records. Indeed, as is commonly known and as the Court is surely aware, Medicare eligibility is age based and Medi-Cal eligibility is income based. As such, depending on a given patient's age the payor was likely entirely Medicare. However, the billing and reimbursement decisions and calculations are made by the programs themselves and are understandably not within Relator's knowledge.

The Court relied on *United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1407 (C.D. Cal. 2014) in taking issue with what the Court found to be a lack of differentiation—a mistake Defendant now overstates as fatal. But *Modglin* does not impose the dollar-by-dollar allocation requirement Defendants suggest. The problem in *Modglin* was not that the relators failed to apportion each reimbursement dollar between Medicare and Medicaid; it was that, after alleging claims to a broad list of programs, relators only supplied reliable indicia for some programs but only generalized allegations for others. 48 F.Supp.3d at 1407-1408. For that reason, allegations related to some of the programs were deemed to fall short under Rule 9 (b).

Here, the SAC does what *Modglin* requires: it identifies the government programs being defrauded and pleads reliable indicia of submission to that program.

KNAPP, PETERSEN & CLARKE

The M.A. Medicare Summary Notice identifies a Medicare-paid hospice claim by Med Plus for September 1-21, 2020, including the provider, claim number, referring physician, and $2,966.78 paid by Medicare and also submitted to Medi-Cal for their portion. *See* SAC, ¶¶ 46-48, Ex. B, ECF #190, page 33 of 45. As to other patients, the SAC explains why Relator cannot yet allocate every dollar between Medicare, Medi-Cal, or some combination of both: the billing information is protected and within Defendants' and/or the government's control. SAC ¶ 50. Nothing in *Modglin* requires a relator, before discovery, to assign each dollar of a mixed Medicare/Medi-Cal hospice scheme to a particular payor; it requires enough program-specific facts to avoid resting on undifferentiated references to unspecified "federal programs." See *Modglin,* 48 F.Supp.3d at 1408. The SAC clears that bar by pleading at least one Medicare-paid claim in detail which simultaneously indicates that Medi-Cal was also billed, and then explains the basis for Relator's knowledge and the current limits on payor allocation.

More importantly, *Modglin* would not undercut the falsity theory alleged in the SAC entirely. Rather, at most it stands for the proposition Relator must show reasonable indicia of submission to both programs. Relator has certainly done so as to Medicare, *see* SAC ¶¶ 23-31, 45-48. Discovery will reflect how much Medi-Cal paid. Given that the Ex. B indicates that Medi-Cal was also billed, that is certainly sufficient at the pleading stage to create an inference that some of the patients victimized by Moving Defendants were enrolled in and eligible for Medi-Cal reimbursement. Given that Medicare and Medi-Cal are similar in all other respects, Relator has met his burden at this pleading stage.[4] Determining which exact dollars

---

[4] Medi-Cal hospice is not a materially different eligibility regime for purposes of falsity. DHCS requires that Medi-Cal-covered hospice services be rendered "in accordance with Medicare requirements," and states that any Medi-Cal recipient certified by a physician as having a life expectancy of six months or less may elect hospice care. *Hospice Care*, Cal. Dep't of Health Care Servs. (Aug. 12, 2026)

(Continued...)

KNAPP, PETERSEN & CLARKE

flowed from each program is what discovery into Defendant's claims records is for, not a pleading. At most, the Court should grant leave to amend as to Medi-Cal allegations specifically if it has any doubts. *See e.g.*, *Modlgin*, 48 F.Supp.3d at 1408 (finding allegations as to Medicare and Medicaid passed muster under Rule 9(b) but allegations as other programs did not).

The third defect described by the Court's Order has also been cured. SAC's falsity allegations do only contain allegations brought on information and belief; they also rest on facts within Relator's personal knowledge as the patients' treating physician, facts within his personal knowledge he obtained through government records (the M.A. Summary Notice and the Noridian portal), and on his firsthand investigation. SAC ¶¶ 40–48. Where any allegation in the SAC is pled made on information and belief, the SAC ***also pleads the factual basis for the belief***, as *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993), requires. The Court's concern should therefore be resolved.

The Court also faulted the FAC for pleading Ghasseminejad's role through officer titles alone. **The SAC now pleads far more**: including that in sworn bankruptcy testimony he admitted that he was aware the hospice companies he

---

(available at https://www.dhcs.ca.gov/services/medi-cal-resources/hospice-care-hospice-information/). The Medi-Cal Provider Manual likewise provides that Medi-Cal hospice services are for terminally ill members, that eligible members are those certified by a physician as having a life expectancy of six months or less, and that hospice providers must maintain the election notice and certification of terminal illness in the member's medical record. *Medi-Cal Provider Manual*, Part 2: Hospice Care 2-3, 6-7 (Aug. 2026). The same manual further provides that, in submitting the Medi-Cal Hospice Program Attestation Form, hospice providers attest that all Medi-Cal policy and applicable state and CMS requirements have been satisfied, and that claims will be denied without a valid attestation form and hospice indicator in the Medi-Cal billing system. *Id.* at 2, 5. Finally, DHCS confirms that Medi-Cal hospice reimbursement rates are calculated based on the annual hospice rates established under Medicare. *Hospice Care*, Cal. Dep't of Health Care Servs. (July 10, 2026) (available at https://www.dhcs.ca.gov/services/medi-cal-resources/hospice-care/).

owned generated approximately $1 million *per month*, funds that he admits he *personally took* and used to service debt on his Beverly Hills residence, SAC ¶¶ 55–56. The SAC also details how Ghasseminejad executed a $7.8 million promissory note and a $10 million guaranty on behalf of the hospice entities. SAC ¶ 57. These facts establish that beyond his title, Ghasseminejad exercised near total economic control over these hospice entities, including their revenue, and their ability to borrow funds. *See* SAC ¶¶ 58–59. This is no longer a case in which titles alone are used to infer conduct. These were Ghasseminejad's companies in name and control. Indeed, he helped himself to the spoils. The Court should not allow him to escape responsibility for the fraud that created those spoils.

**3. *Ebeid*, *Godecke*, and Their Progeny Now Support Denial of Defendant's Motion to Dismiss the SAC.**

The Court's June 24, 2026 Order analyzed Relator's FAC allegations against several key Ninth Circuit cases that examined particularity requirements for the falsity elements. Dkt. 89 at 9-10. As argued below, Relator's added allegations tip the balance in his favor, when comparing the SAC to the allegations at in these cases.

For example, the SAC now compares favorably to *Godecke*, rather than falling short of it. In *Godecke*, the Ninth Circuit found Rule 9(b) satisfied because the relator alleged a specific Medicare billing scheme: KCI delivered wound-therapy VAC devices before receiving the required written order prior to delivery, then submitted claims using the KX modifier, which represented that all Medicare payment requirements had been satisfied, while omitting the EY modifier that would have disclosed missing documentation. *Godecke,* 937 F.3d at 1206-07; 1209. The relator supported falsity with fifteen representative Rental Order Entry numbers, internal reports, and billing/appeals database information that allegedly let her identify claims lacking a required WOPD that were nevertheless paid or appealed, which would have been impossible had the claims included the required EY modifier. *Id.* at 1207-10. The Ninth Circuit did *not* require the relator to plead actual *Medicare claim numbers*;

KNAPP, PETERSEN & CLARKE

the representative identifiers she pleaded were ROE numbers, which the opinion describes as "a unique identifying number assigned to each VAC delivery request," not government claim numbers. *Id.* at 1209-1210. Nor did the Ninth Circuit require her to have personally submitted the claims, personally entered the billing modifiers, or personally observed other employees omit the EY modifier; the Court expressly held the complaint sufficient even though she "never personally was directed not to include an EY modifier or directly observed other employees omitting the EY modifier." *Id.* at 1209.

As to payment, the relator in *Godecke* did not plead that she personally saw Medicare pay each claim in real time; instead, she alleged she could cross-reference internal ROE reports with KCI billing and appeals data to identify ROEs for claims that were "either paid or appealed," which the Court treated as reliable indicia of actual submission and payment/appeal activity. *Id.* at 1209. The opinion likewise did not require or suggest the relator needed to show the precise submission date for each false claim from personal observation; the Court focused instead on the scheme mechanics, the ROE-based examples, the database cross-check, and corroboration from a former colleague who had reviewed claims and confirmed that claims lacking required documentation were submitted without the EY modifier. *Id.* at 1207-10. **That distinction matters**: *Godecke* did not turn on claim-by-claim personal knowledge of claim numbers, submission dates, or payment dates, but on whether the relator pleaded enough particularized facts and reliable indicia to support a strong inference that false claims were actually submitted. *Id.* at 1209-10.

Here, the SAC now identifies how Relator discovered Defendants' fraudulent scheme through denial notices he received when trying to bill of legitimate services, EOBs[5] provided to him by his patients, his review of the Noridian Medicare Portal,

---

[5] Moving Defendants raise a strawman argument concerning the completeness of the exemplar EOBs but that is merely an evidentiary issue, not a pleading issue. The EOB pages are sufficient to create a factual inference in support of Relator's belief as to why he concluded that there was fraudulent activity afoot.

patient interviews, attempted communications with the supposed hospice providers, and even attaches a government Medicare record showing a paid claim for patient M.A for a specific billing period for a specific amount and a specific claim number. SAC ¶¶ 38-48. The SAC also includes Defendant specific allegations by listing several patients and their related conditions and dates of enrollment, and Ghasseminejad's bankruptcy testimony, promissory note, guaranty, all evidencing his control over reimbursement accounts. SAC ¶¶ 38-50, Exs. A-B. These allegations are as much and more than what was required in *Godecke* as Relator has pled a scheme-plus-indicia theory *and an actual paid Medicare example*. Unlike the FAC disapproved of by the Court, the SAC no longer asks the Court to infer submission from enrollment alone; it pleads both a representative paid Medicare claim and a detailed investigative path showing how Relator connected his patients' hospice enrollments to government payment. Based on these additions, *Godecke* now compels a different result.

The SAC also fits the pleading pathway recognized in *Ebeid*, rather than the deficient allegations dismissed there. In *Ebeid*, the Ninth Circuit affirmed dismissal because the relator failed to plead falsity or presentment facts that met the Rule 9(b) particularity requirement. *Ebeid*, 616 F.3d at 999-1002. The relator alleged that the defendant's health care businesses engaged in unlawful corporate practice of medicine and unlawful referrals, and that Medicare would not have paid had it known of the alleged noncompliance, but the court found the corporate-practice theory deficient because the complaint did not identify any statute, rule, regulation, or contract conditioning payment on compliance with that state-law prohibition. *Id.* at 996, 999-1000. The Ninth Circuit also held the allegations were too general because they lacked the "who, what, when, where, and how" of the alleged financial relationship and referrals. *Id.* at 1000-01. And although the court recognized that a Medicare regulation concerning home-health certification *could* support the relator's implied certification theory, it affirmed dismissal because the complaint lacked

KNAPP, PETERSEN & CLARKE

particularized facts tying the regulatory violation to actual claims. *Id.* at 1001-02.

Crucially, *Ebeid* was not dismissed because the relator failed to attach every claim form, plead every claim number, or identify every payment and the Ninth Circuit expressly rejected a categorical representative-claim requirement. *Id.* at 998-1000. What the related in *Ebeid* lacked was the factual bridge between the alleged regulatory or referral violations and actual false claims. *Id*. at 999-1002.

**The SAC now supplies that factual bridge**, and contains the missing details that doomed the *Ebeid* relator. The SAC identifies a concrete Medicare-paid claim for patient M.A., including the hospice provider, service period, claim number, referring physician, and $2,966.78 Medicare payment and concurrent submission to Medi-Cal. SAC ¶¶ 46-48. The SAC also explains how Relator learned the facts through is investigation. *Id.* ¶ 44-48. The SAC also pleads why the claim was false: M.A. allegedly was not terminal, did not receive hospice care, never saw Dr. Lavian, and the Medicare notice denied Relator's own services because the patient was treated as being on a hospice benefit. SAC ¶¶ 37-41, 46-48. The SAC also ties the moving hospice defendants to specific patients, NPIs, enrollment dates, and non-terminal conditions, including Med Plus, Relyable, and VIP. SAC ¶¶ 37, 41, Ex. A. These were the types of details *Ebeid* requires.

The SAC also compares well to *United States ex rel. Everest Principals, LLC v. Abbott Laboratories, Inc*. 622 F.Supp.3d 920, 931-33 (S.D. Cal. 2022). There, the court denied dismissal of relator's FCA claims because the complaint pleaded event-level details, physician-specific conduct, procedure counts, and Medicare payment amounts. *Everest*, 622 F.Supp.3d at 931-33 (S.D. Cal. 2022). Here, the SAC provides the same level of reliable-indicia chain, and in one respect goes further: it identifies an actual Medicare-paid hospice claim for M.A., including provider, claim number, service period, referring physician, and amount paid. The SAC now also compares favorably to *United States ex rel. STF, LLC v. Vibrant Am., LLC*, No. 16-cv-02487-JCS, U.S. Dist. LEXIS 150345, at *40-43 (N.D. Cal. Aug. 19, 2020) by

KNAPP, PETERSEN & CLARKE

providing the reliable "who," "what," "when," "where," and "why" allegations found therein.

*United States v. Azar*, No. 2:20-cv-02450-MEMF-PJW, 2024 U.S. Dist. LEXIS 104745 (C.D. Cal. June 11, 2024) provides further support for Relator. In *Azar*, the relator alleged that an unlicensed medical assistant created fake IVIG prescriptions and prior-authorization letters, falsely represented that they came from the relator physician, and caused Premier Pharmacy to submit government claims for those prescriptions and for infusion sessions that never occurred. *Azar,* 2024 Dist. LEXIS 104745 at 2-5. The relator did not identify each individual false claim submitted to the government nor was that relator in possession of firsthand knowledge as to the billing process or when the claims were submitted. *Id.* ¶¶ 9-11. The court nevertheless denied the motion to dismiss and found relator's allegations to be sufficient under Rule 9(b). *Id.* at 9-11 (relying on both *Ebeid* and *United States ex rel. Grubbs. v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). The decision includes a detailed and sophisticated analysis of *Ebeid* and *Grubbs*, 2024 U.S. Dist. LEXIS 104745 at 9-10; *see also*, *id.* at 18-19, that applies with equal weight to the SAC allegations.

The SAC here supplies allegations of a scheme with reliable indicia and examples of specific patients, an example of a specific false claim, and a detailed explanation for all of Relator's knowledge. The case law relied upon by the Court in its previous order all point toward the same conclusion: Relator's allegations pass muster under Rule 9(b) and the motion to dismiss should be denied.

**3. Defendants' contrary arguments fail.**

Defendants argue that the SAC "equat[es] enrollment periods with false claims" and that Exhibit A "is still not a claim." Dkt. No. 191 at 10–11. Relator does not conflate the two; rather, Relator knew from personal knowledge that his patients were neither eligible for nor receiving hospice services, and he knew from EOBs and information he obtained on the Noridian portal that those same patients were enrolled

in and generating hospice reimbursements. SAC ¶¶ 38–48. Enrollment and payment cannot occur without the submission of claims and certifications, which the governing regulations require. SAC ¶¶ 21, 23–28. Defendants' suggestion that patients can be enrolled and paid for without any claim being submitted "strains credulity." *United States ex rel. CA Challenger LLC v. Emanate Health*, 2024 U.S. Dist. LEXIS 158049, *14 ("It strains credulity to believe that [defendant] falsely admitted patients to general inpatient care but never sought Medicare reimbursement for those claims"); *see also*, *Azar*, 2024 U.S. Dist. LEXIS 104745, *16 ("It would stretch the imagination to infer [. . . ] that the defendant doctors go through the charade [related to the fraudulent conduct] only for the scheme to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed.") Indeed, the reason Relator learned of the hospice enrollments was because his legitimate claims were rejected because the patients *were on a funded hospice benefit*. SAC ¶¶ 25, 38. If somehow these entities were enrolling patients in hospice care and providing them services but *not* billing the government for it—Relator's legitimate claims would not have been blocked—because Medicare would not have known or cared. Defendants ask the Court to draw absurd and implausible inferences and to ignore the obvious. The Court should decline to do so.

Defendants' continued demand for specific claim numbers and billing codes for every patient still exceeds the requirements of Rule 9(b). Dkt. No. 191 at 10–11. The Ninth Circuit requires reliable *indicia*, not a representative claim for every allegation. *Ebeid*, 616 F.3d at 998–99; *Godecke*, 937 F.3d at 1209. The SAC pleads more than the outsider-relators whose complaints were sustained in those cases: an actual government payment record for a named patient, paired with detailed allegations of the scheme and of how Relator learned of it. Relators' allegations are sufficient just like the Relators in *Azar* and *Everest*. Relator allegations are distinct from cases like *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011), where a relator with full record access identified no false claim and

KNAPP, PETERSEN & CLARKE

an "obvious alternative explanation" defeated the inference. Here, the details of M.A.'s claim, the denial of Relator's own claims for the same patient, the details of his investigation, and the corroborating Noridian records foreclose any innocent explanation.

**4. Materiality is adequately pled and is not contested.**

Defendants do not challenge materiality and thereby concede it. In any event, the SAC alleges that hospice eligibility is a necessary condition of reimbursement, so false representations of eligibility are material. SAC ¶¶ 20–28, 66.

**B. <u>The SAC Adequately Pleads Scienter</u>**

Scienter "may be alleged generally." Fed. R. Civ. P. 9(b); *Corinthian Colleges*, 655 F.3d at 996; *see also Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) ("under Rule 9(b), scienter need not be pleaded with particularity, but may be alleged generally"). The SAC pleads scienter both generally and through specific facts.

Defendants again argue that the SAC relies on officer titles, control, and shared addresses, and that its bankruptcy allegations are a "red herring." Dkt. No. 191 at 14–16. That mischaracterizes the pleading and ignores the new allegations in the SAC. Relator previously and continues to allege that Defendant Ghasseminejad was the sole CEO/CFO/Director/Secretary/Agent of the entities with direct authority over all operations, SAC ¶ 96(a); that the related entities shared the same addresses, SAC ¶ 96(b); that the fraud spanned 2018–2021 across multiple entities requiring central direction, SAC ¶ 96(d); that he used paid recruiters who lured non-terminal patients with gifts and false promises, SAC ¶ 96(e); and that family-member patients (M.A., R.T., F.T.) were placed in different entities to distribute claims and "help cover up the scam," SAC ¶ 96(f). Those are allegations of conduct, not bare titles.

Importantly, Relator now adds allegations from Ghasseminehad's bankruptcy testimony, that he controlled revenue from the various hospices and took loans out against those businesses. SAC ¶¶ 55-60. Contrary to Defendant's assertion

otherwise, these new allegations are not a "red herring"—they are direct evidence of knowledge and financial benefit. Ghasseminejad testified under oath that the hospice companies generated approximately $1 million per month and that he personally used those funds to service the debt on his Beverly Hills residence. SAC ¶¶ 56, 96(g). A person who takes $1 million *per month* out of a network of hospice companies, personally guarantees their multimillion-dollar debt, SAC ¶ 57 is not plausibly ignorant of the systematic enrollment of non-terminal patients who were never provided services that was entire model of the business. *See* SAC ¶¶ 58-60. The only reasonable inference from these facts, taken together, is knowledge. *Corinthian Colleges*, 655 F.3d at 996; *Winter*, 953 F.3d at 1122. At the very least, Ghasseminejad's role should be the subject of discovery.

Defendants' contention that the allegation that patients were "manifestly not terminal" is conclusory, Dkt. No. 191 at 15–16, ignores the source of that allegation: Relator's personal treatment of these patients as their PCP, coupled with his firsthand determination that none suffered from a terminal illness. SAC ¶¶ 37-40, 43,44, 96(c). Whether Relator's medical judgment is ultimately correct is a merits question for discovery and trial, not a pleading defect. Defendants remain free to challenge these allegations with evidence; they cannot defeat them on the pleadings.

**C. <u>The SAC Pleads Particularized, Defendant-Specific Conduct and Satisfies Rule 9(b)</u>**

Defendants argue that the SAC "lumps" Defendants together and fails the "who, what, when, where, and how" test. Dkt. No. 191 at 13–14. Not so. Rule 9(b) requires a plaintiff suing multiple defendants to "identify the role of each defendant in the alleged fraudulent scheme," but "a complaint need not distinguish between defendants that had the exact same role in a fraud." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018). The Ninth Circuit distinguishes a "chain conspiracy," where each defendant plays a distinct part, from a "wheel conspiracy," where parallel "spokes" engaged in "precisely the same

KNAPP, PETERSEN & CLARKE

conduct" may be addressed collectively. *Id.*

The SAC pleads a wheel: Ghasseminejad is the hub, and the hospice entities are spokes that each enrolled ineligible patients and billed the government in the same manner. Even so, the SAC does not rely on collective allegations. Through Exhibit A, Relator ties Med Plus (NPI 1164707386) to M.A., R.T., and S.M.; Relyable Hospice Care (NPI 1548539463) to F.G. and F.P.; and VIP Hospice Care (NPI 1124364336) to H.L. and A.M.—each with specific enrollment dates and non-terminal conditions. SAC ¶ 37 & Ex. A. And it pleads a paid Med Plus claim in full detail. SAC ¶¶ 46-48 & Ex. B. Because each entity engaged in the same enrollment-and-billing conduct as a spoke of Ghasseminejad's scheme, "there was no reason (and no way) for [Relator] to differentiate among those allegations that are common to the group." *Silingo*, 904 F.3d at 677.

The point applies with special force to VIP. The Court dismissed the FAC in part because it alleged nothing specific to VIP. The SAC now identifies VIP's NPI, two specific patients (H.L. and A.M.), their enrollment dates, and their non-terminal conditions. SAC ¶ 37 & Ex. A. That is a material change from the FAC and defeats Defendants' VIP-specific argument. Dkt. No. 191 at 14. As to the "who, what, when, where, and how," the SAC identifies the individuals who ran and executed the scheme (Ghasseminejad and named recruiters), SAC ¶¶ 33–34, 51–59; the false conduct (billing government programs for hospice for non-terminal patients who received no services), SAC ¶¶ 34–35, 47; the timing (the enrollment periods in Exhibit A and ¶ 47); the location (the shared addresses), SAC ¶¶ 45, 54; and the mechanics of the scheme, SAC ¶¶ 33–35, 47. Nothing more is required at the pleading stage. *Ebeid*, 616 F.3d at 998–99.

**D. <u>The SAC Pleads a False Records Claim (Count II)</u>**

Defendants argue that Count II fails to identify the false records with particularity. Dkt. No. 191 at 16. The SAC identifies them: the fraudulent Medical Certifications of terminal illness that were a precondition to hospice billing, obtained

from a physician (Dr. Lavian) who never saw the patients, SAC ¶¶ 34, 47, and the resulting hospice claims and per-diem billings submitted to Medicare and Medi-Cal for non-terminal patients, SAC ¶¶ 35, 47. The M.A. Summary Notice documents one such record—a Med Plus claim referred by Dr. Lavian for which Medicare paid $2,966.78, which was concurrently submitted to Medi-Cal for its proportionate share. SAC ¶ 47 & Ex. B. Those allegations identify the records, their falsity, and their materiality to payment.

**E. The SAC Adequately Pleads an FCA Conspiracy (Count III)**

The Court dismissed the FAC's conspiracy claim solely because it found no underlying FCA violation. Dkt. No. 189 at 10–11. Because the SAC now states substantive FCA violations, the predicate for that ruling is gone.

Independently, the SAC pleads the agreement and its participants. It alleges that recruiters ("Tina," "Angelica," and "Guillermo A. Ramirez") solicited patients and sold their Medicare numbers to the hospice companies "for a kick back, referral fee or other compensation," SAC ¶¶ 33–34; that the hospice companies obtained fraudulent certifications from a physician (Dr. Lavian) who never saw the patients, SAC ¶ 34; and that Ghasseminejad, the entities, and Dr. Lavian "conspired to knowingly provide fraudulent medical certifications to government agencies," SAC ¶ 47. Conspiracy liability under 31 U.S.C. § 3729(a)(1)(C) reaches such agreements, and the agreement may be inferred from the coordinated, mutually dependent conduct alleged. Those allegations, taken as true, plead a conspiracy to submit the false claims the SAC identifies.

**F. The California False Claims Act Claim (Count IV) Is Adequately Pleaded.**

The CFCA is modeled on the federal FCA and is analyzed under the same Rule 9(b) standard. Dkt. No. 189 at 11. The Court dismissed the FAC's CFCA claim only because it had dismissed the federal claims. *Id.* Because the SAC now adequately pleads the federal FCA claims—including a Medicare-paid claim and

reliable indicia of submission—the CFCA claim, resting on the same facts, SAC ¶¶ 86–95, survives for the same reasons.

### G. <u>**The Court Should Reject Defendants' Improper Factual Attacks on Exhibit B and on Relator's Character**</u>

Defendants' two principal factual attacks are improper on a motion to dismiss.

*Exhibit B.* Defendants urge the Court to "disregard" the M.A. Medicare Summary Notice because it is labeled "page 1 of 6" but only two pages are attached. Dkt. No. 191 at 12. On a Rule 12(b)(6) motion, the Court must accept Relator's well-pleaded facts as true and draw reasonable inferences in his favor. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). While incorporated documents may be considered, they may not be used to resolve factual disputes against the complaint. *Id.* at 1002-03. Where specific allegations conflict with a non-legally-operative exhibit, the conflict is resolved in the plaintiff's favor. *In re Finjan Holdings, Inc. Sec. Litig.*, 58 F.4th 1048, 1055 (9th Cir. 2023). A plaintiff "pleads himself out" only when the pleadings themselves establish facts compelling dismissal. *Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1174-75 (9th Cir. 2022).

Exhibit B does the opposite: it provides the corroborating evidence relied on by Relator to allege an actual Medicare payment to Med Plus. That the notice is excerpted goes at most to evidentiary weight—a matter for summary judgment or trial, not the pleadings. Defendants' invitation to draw adverse inferences from missing pages is exactly what *Khoja*, 899 F.3d 988, 1003 cautions against. Where Defendants' reading and Relator's reading of the exhibit are both plausible, Relator's allegations control. *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011).

*Relator's Medical Board history.* Defendants ask the Court to take judicial notice of Relator's California Medical Board disciplinary decisions to suggest he is unqualified to opine that his patients were not terminal. Dkt. No. 191 at 2, 19. As stated above, that would be an improper use of judicial notice. *Khoja*, 899 F.3d at

KNAPP, PETERSEN & CLARKE

999; *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

Defendants' reliance on Relator's earlier scheduling-motion statement that he lacked "claims data" (Dkt. No. 148) fails for the same reason: it asks the Court to weigh an extrinsic representation against the SAC's well-pleaded allegations, which the Court must instead accept as true. *Lee*, 250 F.3d at 690. In all events, the SAC does not depend on comprehensive claims data; it pleads a specific Medicare-paid claim from the M.A. Summary Notice and other reliable indicia for the scheme obtained from the Noridian portal. SAC ¶¶ 47–48.

### H. <u>Dismissal With Prejudice Is Not Warranted</u>

Defendants ask for dismissal with prejudice, but the SAC states viable claims and the motion should simply be denied. Should the Court nonetheless find any allegation wanting, such as more specific insight into the Medicare and Medi-Cal benefits framework, or would prefer that the allegations – even if repetitive – be separately pleaded against each entity, that certainly can be done; therefore, leave to amend remains appropriate. This is the first time the SAC's new allegations—the M.A. Medicare payment, the Noridian records, the differentiated Exhibit A, and Ghasseminejad's sworn bankruptcy admissions—have been before the Court, and Relator has diligently responded to the Court's prior guidance. As noted by this Court, dismissal without leave is improper "unless it is clear that the complaint could not be saved by any amendment." Dkt. No. 189 at 12.

## VI. CONCLUSION

Relator respectfully requests that the Court deny the Motion or grant leave to amend.

Dated: August 21, 2026

KNAPP, PETERSEN & CLARKE
KRAMER BROWN HUI LLP

By: /s/ /Sam Brown
Mitchell B. Ludwig
Sam Brown
Attorneys for Plaintiff and Relator HARRY LIFSCHUTZ, M.D., an individual